The **INDIAN LOOKOUT ALLI-ANCE** et al., Appellants,

v.

**John A. VOLPE, as Secretary of Transportation, et al., Appellees.**

No. 72–1620.

United States Court of Appeals, Eighth Circuit.

Submitted April 26, 1973.

Decided Aug. 22, 1973.

Rehearing Denied Oct. 4, 1973.

Robert B. Scism, Des Moines, Iowa, and John F. Hellegers, Washington, D. C., for appellants.

Asher E. Schroeder, Sp. Asst. Atty. Gen., and Allen L. Donielson, U. S. Atty., Des Moines, Iowa, for appellees.

Before GIBSON, LAY and STEPHENSON, Circuit Judges.

GIBSON, Circuit Judge.

This case concerns the scope and extent of an Environmental Impact Statement relating to the construction of highways intended to be funded in part by federal funds. In other words, what is the minimum appropriate length of a highway project to be environmentally considered under the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 *et seq.*?

The Iowa State Highway Department (ISHD) in 1965 adopted a plan for the construction of 1,877.94 miles of road throughout the state. This earlier plan was revised in February 1968 as a Freeway-Expressway System to compliment the existing system of federal and state roads. The plan was submitted to the Federal Highway Administration (FHWA) that same year for informational purposes. The location of the Freeways and Expressways set forth in the plan are not precisely located but delineated within a three-mile corridor. No approval has been requested of the FHWA for the system, and it is contemplated that only piecemeal segments of specific projects will be submitted for federal approval as funds are available for its implementation.

Iowa has requested federal funding of the northern seven-mile segment of Project F–518–4, part of proposed Freeway 518. The plaintiffs [1] are environmental groups and individuals interested in preserving the Indian Lookout area through which an extension of the seven-mile segment would extend. The plaintiffs maintain that an Environmental Impact Statement (EIS) pursuant to 42 U.S.C. §§ 4332(2)(C) and (D) is required on the whole 1,877-mile system or, at the very minimum, on the entire Freeway 518 project, which embraces a route from the Missouri line at Keokuk, Iowa, north and westerly to the Minnesota line. This project generally follows present U.S. 218 with some significant departures and would also be renumbered U.S. 218 when completed. The F–518 project was so designed by Iowa to qualify for federal assistance under 23 U.S.C. § 101 et seq.[2]

Project F–518–4 is a 14-mile segment bypassing Iowa City from Interstate 80 on the west to U.S. 218 and continuing south on 218 for seven miles. Iowa at this time has only sought federal funding on the northern seven-mile segment of this 14-mile project. The southern seven-mile segment cuts directly through the Indian Lookout area of thickly wooded hills and bluffs overlooking the Iowa River valley, an area of scenic, geological, historical and archaelogical significance. The District Court for the Southern District of Iowa, Judge William C. Stuart footnote 3 at 13 required the Environmental Impact Statement to include the entire 14-mile project, but held that to require an Environmental Impact Statement over the entire system or even for Freeway 518 would be highly impractical.[3]

1. The plaintiffs-appellants are: The Indian Lookout Alliance, an association of persons residing in the area, including affected property owners; Iowa Citizens for Environmental Quality, Inc., a nonprofit corporation committed to the preservation of environmental values and natural resources; Citizens for Environmental Action, Inc., a similar nonprofit corporation; and individual members of the above groups.

2. 23 U.S.C. § 120(a) provides for 70 per cent federal funding of the construction cost of Federal-aid primary highways (50 per cent prior to July 1, 1973).

3. The District Court held:

"Plaintiffs' contentions that there should be an environmental impact statement prepared for Freeway 518 and the Freeway-Expressway System will be considered together. These are

The plaintiffs maintain that since the Freeway-Expressway System plainly contemplates the completion of F–518 as a whole and the completion of the 1,877-mile system with at least partial federal funding, the construction of F–518 and the entire 1877-mile system constitutes a "major federal action" pursuant to 42 U.S.C. §§ 4332(2)(C) & (D).[4] Further, to allow environmental impact statements to be filed as construction proceeds in a piecemeal fashion, thus limiting the impact and scope of an environmental analysis to relatively small segments under construction, would result in ignoring the environmental impact of the entire system, in determining its ultimate effect on the environment, and in weakening the consideration of alternatives. An added factor is injected into the problem in that the construction of a small segment after a limited impact statement could set the course or pattern for a considerable portion of the system so that little flexibility would be left in the later stages of the system's implementation, and, therefore, no consideration of the environmental impact of the entire plan would ever have been made. As pointed out, the Environmental Impact Statement filed only embraced the northern seven-mile segment of F–518–4.

 We are confronted with a preliminary question of when the building of F–518 or of the entire 1,877-mile system constitutes major federal action so as to make NEPA applicable. Undoubtedly, the federal financing of four-lane divided highways, which are designed and built by state highway departments, constitutes "major federal action," but there is a difference of opinion as to when and at what point in planning or construction, the project, either considered as a whole or in segments, becomes a federal action.

The defendants contend that a highway project is not "federal" until the FHWA grants location approval, where-

---

nothing more than tentative plans for future highway construction for at least 20 years. The map introduced as an exhibit shows only general corridors, which are subject to change. Federal approval has not been requested and is not needed for such planning. No federal money has been involved. Neither has reached the stage of being a 'major federal action.' It would be impossible to prepare an E.I.S. on such indefinite proposals and it would be highly impractical to require it. In my opinion nothing in the law or regulations requires an E.I.S. on either the proposed Freeway-Expressway System or proposed F–518."
345 F.Supp. 1167, 1169–1170 (1972).

4. 42 U.S.C. §§ 4332(2)(C) & (D) read:
 "(C) [I]nclude in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
 "(i) the environmental impact of the proposed action,
 "(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
 "(iii) alternatives to the proposed action,

"(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
"(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;
"(D) [S]tudy, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources. . . ."

as the plaintiffs contend that a project is "federal" prior to location approval, because location approval must be preceded by a public hearing pursuant to 23 U.S.C. § 128(a) and preparation of a draft Environmental Impact Statement, as required by FHWA pursuant to PPM 90–1.[5]

Since a major highway system is an ongoing continuing octopus of concrete and asphalt ribbons covering continuously more and more of the available land area of a state, yet necessary in significant respects to meet the transportation needs of our country, the highway problem and how is it to be considered and implemented under NEPA requires special consideration. It is not akin to a single project such as a bridge, dam, arsenal, or even a federal complex. It has unique characteristics, being not only statewide in scope, but interstate and international since these highway routes run throughout the country and even into foreign countries.

In considering when the requirements of NEPA become applicable to highway projects, it is helpful to set forth generally how the Federal-Aid Highway Program is administered.[6] The Federal–Aid Highway Act, 23 U.S.C. § 101 et seq. requires a state highway department to obtain two federal approvals in order to be reimbursed for project costs; program approval [7] and plans, specification, and estimates (PS&E) approval.[8]

In addition to the above statutory approvals, FHWA regulations and PPM 20–8 call for three additional approvals. 23 C.F.R. § 1.12 (1972) provides: "No work shall be undertaken on any Federal-aid project, nor shall any project be advertised for contract, prior to authorization thereof by the Administrator." PPM 20–8, *supra* note 5, requires states to receive location approval, which must follow a corridor public hearing; and design approval, which must follow a design public hearing. Location and design approvals do not obligate the Federal Government to contribute to the project's costs but are necessary steps for a state to remain eligible for federal reimbursement.

A state does not request approval of plans by the FHWA until a highway has been broken into projects [9] by the state.

---

5. Policy and Procedure Memorandum (PPM) 20–8 was adopted as an administrative guideline by the FHWA to assess the economic effects of a highway location under the old Federal-Aid Highway Act, 23 U.S.C. § 128, which act was amended on August 23, 1968, to require public hearings and consideration of not only the economic effects of a highway location but also its social effects and its "impact on the environment." See PPM 20–8, 23 C.F.R.App.A., issued January 14, 1969.

 The National Environmental Policy Act of 1969, 42 U.S.C. § 4331(b), et seq., became effective January 1, 1970, which contained more detailed requirements concerning environmental impact than the older Federal-Aid Highway Act. PPM 90–1 was issued under date of August 24, 1971, setting forth guidelines for implementing § 102(2)(C) of NEPA, 49 U.S.C. § 1653(f) (§ 4(f) of Department of Transportation Act), 16 U.S.C. § 470f (§ 106 of National Historic Preservation Act), and § 309 of the Clean Air Act of 1970.

6. See R. Peterson and R. Kennan, Jr., The Federal-Aid Highway Program: Administrative Procedures and Judicial Interpretation, 2 Envir.L.Rep. 50001 (hereinafter Peterson and Kennan), for a more extended discussion of the administration of the program.

7. Section 105(a) requires the submission of "programs of proposed projects" for approval, "as soon as practicable after the apportionments for the Federal-aid systems have been made for any fiscal year." Program approval does not, however, relate to any broad plans of the state as involved in this case, but means individual projects.

8. Section 106(a) requires approval of plans, specifications, and estimates for each proposed project included in an approved program. Upon PS&E approval the federal government becomes contractually obligated to pay its proportionate share of the cost.

9. 23 C.F.R. § 1.2(b) (1972) defines project as:
 "An undertaking by a State highway department for highway construction,

In segmenting a proposal into projects the primary considerations are the length in miles, similarity of type of construction, dollar cost, and availability of funds.[10]

Thus, the present technique of constructing highways in segments and the method of financing would inhibit the treatment of a statewide highway system as a single unit for the purpose of federal approval. It would be extremely uneconomical and timewasting to require the interested state and federal officials to compile an EIS on an entire system that may not be completed as then visualized.

There is no case yet decided that meets exactly the question of the earliest point in time at which a state highway plan becomes a major federal action. There are cases holding that a highway is federal when it receives location approval from the FHWA. City of Boston v. Volpe, 464 F.2d 254, 259 (1st Cir. 1972) (airport case); Lathan v. Volpe, 455 F.2d 1111 (9th Cir. 1971); Sierra Club v. Volpe, 351 F.Supp. 1002, 1007 (N.D.Cal.1972); La Raza Unida v. Volpe, 337 F.Supp. 221, 227 (N.D.Cal. 1971).

█ It is not disputed that any project for which federal funds have been approved or committed constitutes a major federal action bringing into play the requirements of NEPA. However, as noted in La Raza Unida v. Volpe, *supra*, state highways constructed without federal funds or with no intention to seek federal funds are not covered by NEPA. The gray area arises in the third class of highways for which a state has not presently sought federal funds but has maintained its option of later securing federal funds at various stages. We are not at this point overly concerned with making more precise delineations among the different types of highway projects, as we are here concerned with a 14-mile segment on which federal funding is sought and an adjoining 20-mile segment, F–518–3, on which federal funding will be requested. So far as the record discloses no additional federal funds are sought at this time for the purpose of constructing other parts of the system. We may assume that the ISHD desires to keep open its options to secure federal funds for other sections and segments of its highway program as its implementation progresses.

█ While there are cases holding that projects at the planning stage constitute major federal action,[11] these involve single projects. A Liquid Metal Fast Breeder Reactor Program in *Scientists' Institute* was initially a federal action, and *Schuler* dealt with approach roads for a proposed bridge. The instant case is not a single project, however there is no doubt that location approval is a critical stage in determining when a project becomes a "major Federal action." As reasoned in La Raza Unida v. Volpe, *supra*, 337 F.Supp. at 227:

"The state should not have the considerable benefits that accompany an op-

including preliminary engineering, acquisition of rights-of-way and actual construction, or for highway planning and research, or for any other work or activity to carry out the provisions of the Federal laws for the administration of Federal aid for highways."

10. The way Federal-aid highway funds are disbursed may be seen as contributing heavily to this practice by the states. Peterson and Kennan, *supra*. Federal-Aid highway funds are apportioned among the states according to formulae contained in 23 U.S.C. § 104 and are not designated for use in relation to any particular project within the state. The

state requests approval of a particular project, and upon approval the FHWA considers the amount obligated as available only for that project. Therefore, if a state requests approval of a large construction project, e. g., Freeway 518, that could tie up the available federal funds only on that project although the funds might not actually be spent or needed for a number of years.

11. Scientists' Institute for Public Information, Inc. v. Atomic Energy Commission, 481 F.2d 1079 (D.C.Cir.1973); City of Rye, New York v. Schuler, 355 F.Supp. 17 (S.D.N.Y.1973).

tion to obtain federal funds without also assuming the attendant obligations. Any project that seeks even the possible protection and assistance of the federal government must fall within the statute and the regulations."

Since we have location approval, we need not explore the earliest time NEPA becomes applicable, except as to resolve whether the scope extends to the whole system or the entire F–518 project.

The Council on Environmental Quality (CEQ) Guidelines [12] are not supportive of plaintiffs' position. The Guidelines are directed to federal agencies and require an assessment of environmental impacts before federal decision-making. The first federal decision involved in approval of a state highway program is granting location approval. Before that time the FHWA has no control over subsequent state action that might affect the plan. It would be impractical to require the expenditure of considerable amounts of time and money by the federal government on indefinite or tentative proposals before it can be said that they have become a major federal action.

This conclusion is further supported by City of Boston v. Volpe, 464 F.2d 254, 259 (1st Cir. 1972). There the factual situation showed a request for a federal grant from the Federal Aviation Administration and a tentative allocation of federal funds, which was followed by a formal application for the funds by the Massachusetts Port Authority. The First Circuit found no federal action at that present time, since 49 U.S.C. § 1716 contemplates a single decision to fund or not to fund an airport program. Until a decision had been made to commit federal funds the project remained state in nature. *Accord*, Northeast Area Welfare Rights v. Volpe, 2 ERC 1704 (E.D.Wash.1971).

For the purposes of this suit, we hold that the requirements of NEPA and related acts applied when the State Highway Department sought location approval for the proposed highway, but still remaining for resolution is the issue of the scope and extent of the environmental impact study necessary under the pertinent acts.

▉ Preliminarily we note that the District Court held that an EIS was required for the entire 14-mile length of Project F–518–4, even though the southern seven-mile segment had received federal design approval prior to January 1, 1970, the effective date of NEPA. This ruling is correct.[13]

▉ Plaintiffs contend that division of a highway into segments, such as the 14-mile segment approved by the District Court, precludes meaningful compliance with the statutory mandate to assess in detail environmental impacts, as each segment that is approved limits the alternatives for each succeeding

---

12. Guidelines for Federal Agencies Under the National Environmental Policy Act, 36 Fed.Reg. 7724–29, April 23, 1971. Section 2 reads in pertinent part: "As early as possible and in all cases prior to agency decision concerning major action that significantly affects the human environment, Federal agencies will . . . assess in detail the potential environmental impact."

13. That the provisions of NEPA are applicable to projects initiated prior to the effective date finds full support among the cases. *See, e. g.*, Environmental Defense Fund, Inc. v. Corps of Engineers, 470 F.2d 289 (8th Cir. 1972); Calvert Cliffs Coordinating Committee v. United States Atomic Energy Commission, 146 U.S.App.

D.C. 33, 449 F.2d 1109 (1971); Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323 (4th Cir.), cert. denied, *sub nom.* Fugate v. Arlington Coalition on Transportation, 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261 (1972). This conclusion is further supported by the CEQ Guidelines, *supra* at 7727, which reads:

"11. *Application of Section 102(2)(C) procedures to existing projects and programs.* To the maximum extent practicable the Section 102(2)(C) procedure should be applied to further major federal actions having a significant effect on the environment even though they arise from projects or programs initiated prior to enactment of the Act on January 1, 1970. . . ."

segment. The issue of the proper length of highway segment to be included in an impact statement has been considered by several courts. In Thompson v. Fugate, 347 F.Supp. 120 (E.D.Va.1972), dealing with a circumferential highway around Richmond, Virginia, the court found that the project could not be split up into separate 21-mile and eight-mile segments for the purpose of assessing environmental impact, but rather the entire beltway project must be considered as a whole. To fractionalize the project would be "to ignore the facts and reasonable inferences to be drawn therefrom." Thompson v. Fugate, *supra* at 124. The court in Committee to Stop Route 7 v. Volpe, 346 F.Supp. 731 (D. Conn.1972), found a 3.1 mile segment inappropriate as the subject for an EIS and said:

> "While no precise mileage for an appropriate length can be specified, the test is whether the length selected assured adequate opportunity for the consideration of alternatives (both whether and where to build) required by the Act." 346 F.Supp. at 740.

The nature of the proposal will bear on the determination of the appropriate length to be covered, as the length ". . . obviously need not be so extended that consideration of alternatives overlooks a major objective of building the proposed highway." Committee to Stop Route 7 v. Volpe, *supra* at 740. If the major objective of a proposal is to connect two cities by expressway, then these two termini should determine the proper scope of the EIS. The District Court in Citizens v. Brinegar, 357 F. Supp. 1269 (D.Ariz.1973), approved the division of approximately 60 miles of Interstate Highway 10 leading into Phoe-

nix into three segments for purposes of preparing an EIS. The segments covered 29 miles through generally vacant desert land, 15 miles through agricultural land, and 16 miles through urbanized Phoenix. The court felt that, absent a showing of piecemealing to avoid statutory requirements like that condemned in Named Individual Members of San Antonio Conservation Society v. Texas State Highway Dept., 446 F.2d 1013 (5th Cir. 1971), there was nothing to justify a requirement that the segments be covered in one EIS.

The FHWA's PPM 90–1, 37 Fed.Reg. 21809 (October 14, 1972), is helpful in setting forth basic guidelines. Section 6 of 90–1 provides that:

> "The highway section included in an environmental statement should be as long as practicable to permit consideration of environmental matters on a broad scope. Piecemealing proposed highway improvements in separate environmental statements should be avoided. If possible, the highway section should be of substantial length that would normally be included in a multiyear highway improvement program."

Section 3(a) defines highway sections as:

> "A substantial length of highway between logical termini (major crossroads, population centers, major traffic generators, or similar major highway control elements) as normally included in a single location study."

The requirement of PPM 90–1 is in line with the recommendations of the Council on Environmental Quality.[14]

 Because of the expensive nature and the unique characteristics of a

14. Memorandum from Council on Environmental Quality to Federal Agencies on Procedures for Improving Environmental Impact Statements, May 16, 1972, reprinted in 3 Envir.Rep. (BNA) Current Developments, May 19, 1972 at 82–87. Recommendation 9 provides:

"In preparing statements, agencies should give careful attention to formulating an appropriate definition of the scope of the project that is the subject of the statement. In many cases broad program statements will be appropriate, assessing the environmental effects of a number of individual actions on a given geographical area, or the overall impact of a large scale program or chain of contemplated projects. . . ."

network of highway routes comprising a statewide highway plan, coupled with the facts that such plans must of necessity be projected over a relatively long span of time and be flexible in order to allow modifications to meet unforeseen and untoward developments, we do not think the overall project is subject at the outset to the requirements of NEPA. Such plans usually are and should be visionary, subject to extensive modification and dependent to a large degree upon the availability of both state and federal funds. A state, therefore, should not be placed in a vise in which it can do nothing to take care of present traffic needs, to provide bypassing of congested areas, or to construct needed highways until an extensive time-consuming study has been made of the entire plan. A consideration of the whole system would engender many disputes on location and environmental effects. In fact it is conceivable that localized disputes over locations could develop over all the routes so that it would be impossible to settle all of the local disputes and resolve an integrated statewide system before the system itself became outmoded. The study, public hearings that should be held relative thereto, and attendant legal battles could engender objections that could well be insurmountable as a whole, cause years of controversy and debate, and in effect stymie the capital operation of the highway department. This could reduce a state highway department to a standby status unable effectively to conceptualize long-range plans and upgrade present facilities.

On the other hand, we do not want to minimize the benefits and the need for long-range planning and also the advisability of at some point considering the long-range environmental effects of a state highway system. In order to accommodate and balance these two major considerations, we think that as a practical matter it is necessary to permit the division of a state highway plan into segments for the purpose of environmental considerations. This division to some extent could correlate with present technological and financial practices that dictate the present piecemeal type operation. However, in order to comply with the spirit and objectives of NEPA to safeguard natural resources while effectively applying the arts and the sciences in utilizing our natural resources and to cause a meaningful consideration of environmental effects along with a consideration of alternatives, the minimum length of state highway projects that are supported in part by federal funds must be extended to embrace projects of a nature and length that are supportable by logical termini at each end. A single project, such as the San Antonio Freeway route from the airport to downtown in Named Individual Members of San Antonio Conservation Society, *supra,* could not have been broken into segments at all for the purposes of NEPA. Segments that fit into an overall highway plan should be as large as is feasible under present construction and financing practices and at least be independently supportable by meaningful terminal points. However, an impact statement can be more extensive than the proposed project.

The crucial question here is whether the 14-mile segment of F–518–4 is an appropriate segment for the present EIS. We do not think it is. It does not have an independent utility of its own, which would require that it end in major termini, *i. e.* present major highways or cities.

Project F–518–4's northern terminus is Interstate Highway 80, a major east-west route across the state of Iowa. This clearly qualifies as a major terminus. The southern terminus, as it appears on the record, is the Johnson County line, where it would connect to Project F–518–3 (a proposed extension of Freeway 518 through Washington County), which is already in project stage at the state level and has apparently received an approval from the FHWA. It does not appear that a county line would be a major terminus for an appropriate segment. Where, as

here, there is a commitment to further extension appearing on the record, we do not believe it can be said that Project F–518–4 has the requisite independent utility to be the appropriate segment to be covered by the Environmental Impact Statement. The EIS should be enlarged to include Project F–518–3 and an extension thereof until it intersects with present U.S. 218, approximately 22 miles south of the southern terminus of Project F–518–4.[15]

While this terminus at the intersection of proposed Freeway 518 with present U.S. 218 is not entirely satisfactory and more a product of practical necessity in breaking down the entire project into workable segments, it does have the advantage of allowing the improvement to be of continuing utility and use, even if the balance of the route to the Missouri line is never constructed. The record does not disclose when the southern part of proposed Freeway 518 to the Missouri line is projected, and, of course, it is not the function of federal courts to dictate to state highway departments how and when they should carry out their state imposed duties. It appears to us that the decision here is at least a reasonable balancing of objectives in meeting this admittedly difficult problem. We are confronted here with a new law that is now in the process of being implemented, considered, and interpreted under varying factual situations, so that decisional precedent is scarce. It will only be through a series of interpretations under varying and contrasting factual situations that a better and more precise standard can be conceptualized and articulated.

The case is remanded to the District Court for proceedings consistent with this opinion and for modification of its order on Project F–518–4 to include

Project F–518–3 to its presently contemplated southern terminus and beyond to the project's intersection with present U.S. 218 to the south.

15. Our conclusion with regard to the mileage to be included in the EIS, it should be emphasized, is only approximate and is based upon defendant's answers to interrogatories which detail the proposed route of Freeway 518 from Interstate 80 to Keokuk, Iowa. The record in the case did not include a map delineating the proposed route of Project F–518–3 or its extension to the intersection with present U.S. 218 which would have allowed a more precise ascertainment of the mileage involved.