FARMLAND PRESERVATION ASSOCI-
ATION et al., Plaintiffs,

v.

Brock ADAMS et al., Defendants,

Waterloo Chamber of Commerce, Cedar
Falls Chamber of Commerce, Industrial
Development Association of Cedar Falls,
Waterloo Industrial Development Asso-
ciation, Teamster Local Union No. 844,
and Kroblin Transportation Systems,
Inc., Intervenor Defendants.

No. C 78–99.

United States District Court,
N. D. Iowa,
Cedar Rapids Division.

June 19, 1979.

Bruce J. Terris, Edward H. Comer, Washington, D. C., Keith Mossman, Vinton, Iowa, for plaintiffs.

Thomas J. Miller, Atty. Gen., Des Moines, Iowa, Robert W. Goodwin, Sp. Asst. Atty. Gen., D.O.T., Ames, Iowa, for State defendants.

James H. Reynolds, U. S. Atty., Judith A. Redmond, Asst. U. S. Atty., Cedar Rapids, Iowa, for federal defendants; Donald C. Vosborgh, Regional Counsel, Federal Highway Commission, Kansas City, Mo., of counsel.

Cecil L. Goettsch, Kent M. Forney, Patrick B. Northup, Des Moines, Iowa, for applicant intervenor-defendants Waterloo Chamber of Commerce, Cedar Falls Chamber of Commerce, Industrial Development Association of Cedar Falls, Waterloo Industrial Development Association, Kroblin Transportation Systems, Inc. and Teamster Local Union No. 844.

## ORDER

McMANUS, Chief Judge.

This matter is before the court on all parties' resisted cross-motions for summary judgment, filed March 19, 1979 by plaintiffs, April 9, 1979 by defendants, and April 10, 1979 by intervenor-defendants. Plaintiffs' motion denied; defendants' and intervenor-defendants' motions granted.

### Introduction

In this action, plaintiffs seek declaratory, injunctive and mandamus relief, claiming that a final environmental impact statement (EIS) submitted in connection with the proposed construction of a 47.6 mile segment of Interstate Highway 380 (I–380) between Cedar Rapids and Waterloo, Iowa, does not meet and therefore violates the requirements of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.* By agreement of the parties and order of the court the matter was submitted for decision upon the cross-motions, stipulations of facts, and a briefing schedule. All affidavits, exhibits, briefs and other documents having been submitted, the case is ready for decision. No genuine issue of material fact exists; the sole issue for decision being the legal adequacy of the EIS in light of NEPA. The underlying factual history follows.

*Facts*

This case has its ultimate beginnings in 1956 when the Iowa State Highway Commission—now the Iowa Department of Transportation (IDOT)[1]—began efforts to obtain approval of additional interstate highway mileage, under the 1956 Federal-Aid Highway Act.[2] In 1968, the United States Congress increased the limit of total mileage for the national interstate highway system to 42,500 miles. As a result of the increased limit of mileage for the national interstate system, the State of Iowa received approval for an additional 71 miles of interstate highway to be constructed in Iowa. A portion of this approved additional mileage was to commence at I–80 near Iowa City, pass through Cedar Rapids and proceed to the intersection of U. S. Highways 218 and 520 in Waterloo.[3] The segment of interstate highway at issue in this case forms a part of this portion and constitutes a 47.6 mile connection between Blairs Ferry Road in Cedar Rapids with U. S. Highways 218 and 520 in Waterloo.

1. The IDOT is an agency of the State of Iowa with jurisdiction and control over the primary highway system in Iowa. In such capacity it has the authority to establish and construct new interstate highways that are approved by the Secretary of the United States Department of Transportation as part of the national interstate highway system. *See, e. g.,* Iowa Code §§ 306.3(3), –.4(1) (1979).

2. The 1956 Act limited the total mileage for the national Interstate Highway System to 41,000 miles. Of that total, the State of Iowa was allotted 710 miles of interstate highway.

3. The approval is dated December 13, 1968, and also provides for a one mile segment of I–129 situated south of Sioux City and proceeding on an east-west axis across the Missouri River. In July, 1974 additional mileage was also approved involving a segment of interstate highway commencing at the intersection of U.S. Highways 218 and 520 in Waterloo, passing through Waterloo and proceeding to U.S. Highways 218 and 20 in Cedar Falls. Neither the Sioux City nor Cedar Falls segment is at issue in this case.

4. The approval and construction sequence for the various segments of I–380 from I–80 near Iowa City through to Blairs Ferry Road in Cedar Rapids, which were not the subject of the EIS at issue in this case, is as follows:

The United States Secretary of Transportation, through the Federal Highway Administration (FHWA), has the responsibility for approval of state highway departments' requests for routes on the interstate highway system, 23 U.S.C. § 103(e), and for approval of plans and specifications for each proposed interstate highway project, 23 U.S.C. § 109(b). The proposed segment of I–380 at issue here is eligible for 90% federal funding as part of the national interstate highway system. Federal funding approval for highway projects, however, requires three stages of consideration. The first stage is submission of the location of the proposed highway corridor, which is considered in a corridor approval hearing held by the State. The second stage is consideration of the design of the proposed highway, which is the subject of a design hearing. The final stage is the submission of the project by the state to the FHWA for "projects, specifications and estimates" approval.

On March 17, 1971, the FHWA approved the draft EIS for the 47.6 mile segment of I–380 at issue here.[4] Informational hear-

The 13.3 mile segment of I–380 from I–80 near Iowa City to Highway 84 just south of Cedar Rapids was completed and open to traffic on September 19, 1973. There was no draft or final EIS for this segment because it was approved by FHWA prior to the requirements of NEPA.

On the 7 mile segment of I–380 from Highway 84 to 8th Street, NE in Cedar Rapids, the FHWA issued on September 21, 1973 an environmental reassessment determining that there was no need for an EIS with respect to that segment. The portion of I–380 from Highway 84 to 5th Avenue, SW was completed and open to traffic on June 25, 1976.

On the segment of I–380 from 8th Street, NE to J Avenue in Cedar Rapids the FHWA approved the draft EIS on March 17, 1971, and the final EIS on April 25, 1972. The FHWA gave design approval for this segment on June 8, 1972.

On the segment of I–380 from J Avenue to Blairs Ferry Road the FHWA approved the draft EIS on May 8, 1975, and the final EIS on June 1, 1977. The FHWA gave design approval for this segment on August 5, 1977, for the southern portion and August 25, 1978, for the northern portion. The portion of I–380 from 5th Avenue, SW to Blairs Ferry Road in Cedar Rapids is expected by the Department of Transportation to be open to traffic in the fall of 1980.

ings concerning the I–380 project were held in Vinton on November 29, 1971; in Waterloo on November 30, 1971; in Independence on December 1, 1971; and in Cedar Rapids on December 2, 1971.

Corridor hearings for this proposed segment were held in Cedar Rapids and Waterloo on May 24, 1972, and May 25, 1972, respectively. On December 20, 1972, the IDOT voted to build this segment along the "Raymond" alternate as described in the EIS.[5] The final EIS for this segment (Plaintiffs' Exhibit 3 and Defendants' Exhibit 2) was issued in March, 1975 and approved by the FHWA on June 17, 1975. The FHWA gave corridor approval on June 22, 1975.

Design hearings for this proposed segment were held on January 12 and May 10, 1978, in Center Point; March 30, 1978, in Urbana; on May 11, 1978, in LaPorte City; and on June 29, 1978, in Gilbertville. The FHWA gave design approval for most of this segment during the period from June through September, 1978.

As of February, 1979, defendants had acquired at least 70 parcels of land in the right of way for this segment of I–380,[6] and were preparing appraisals for many more. They intend to have completed appraisals for 284 parcels by April, 1979 and to purchase properties within 90 days of the completion of each appraisal. Defendants do not plan to begin grading or other construction activities on the majority of the right of way for this segment until April, 1980. This segment of I–380 is planned to be open to traffic in the fall of 1981.

Since plaintiffs' contentions also raise issues concerning the adequacy of the EIS with respect to the possible relationship between the proposed I–380 segment at issue here with Arterial Highway 518, the factual record relating to such issues is stated at this juncture.

In Iowa, the state's "Freeway" system, which was subsequently renamed the "Arterial Highway" system, is intended to supplement the national interstate highway system.[7] Somewhat contemporaneously with its efforts to obtain approval of additional interstate mileage to be constructed in Iowa, the IDOT adopted in 1965 as part of its proposed Arterial Highway (Freeway) system a plan to construct Arterial Highway 518 as a four-lane divided road, similar in part to interstate highway standards, through east central Iowa on a north-south axis beginning at Keokuk (passing through or near Iowa City, Cedar Rapids, and Waterloo) and extending to I–35 near Garner.

Construction of a portion of this Arterial Highway 518, to run south from I–80 near Iowa City to the vicinity of state highway

---

With respect to the segment of I–380 from the junction with U.S. Highways 218 and 520 in Waterloo to the junction of U.S. Highways 218 and 20 in Cedar Falls, the FHWA approved the draft EIS on April 7, 1977, and the final EIS on February 6, 1979. The FHWA has not given corridor or design approval on this segment to date. This segment is planned by the IDOT to be open to traffic after 1984.

**5.** The "Raymond" alternate would extend diagonally in a northwest direction from Blairs Ferry Road in Cedar Rapids to the intersection of U.S. Highways 218 and 520 in Waterloo, and would cut across land presently used for agricultural purposes.

**6.** Defendants have agreed not to acquire any parcels by means of their powers of condemnation or eminent domain, pending the court's issuance of final judgment in this case. They are, however, continuing to pursue acquisitions by voluntary means. *See* Joint Motion filed March 16, 1979.

**7.** The design standards of an interstate highway are established as having controlled access and divided highways with a minimum of four traffic lanes. 23 U.S.C. § 109(b); 23 CFR § 625.3(a)(3). *See generally* American Association of State Highway Officials, "A Policy on Design Standards: Interstate System" (Defendants' Exhibit 1). In Iowa, a "Freeway" and interstate highway were designed to the same standards. The federal government contributes a greater portion—90%—of the expenses of constructing an interstate highway. However, as of 1976, the designation of a "freeway" was eliminated by the IDOT and replaced by the designation "Arterial Highway", which has no specific design standards. *See* Stipulation of the Parties No. 11.

92 in Washington County,[8] is expected to begin in the summer of 1979. Arterial Highway 518 from I–80 south to state highway 22 will be a four-lane divided highway with access control. South of highway 22 to its junction with state highway 92, it will be a two-lane highway without full access control.

The IDOT has no specific plans for any further improvement of Arterial Highway 518 south of state highway 92 in Washington County at this time except for a five-mile segment (proceeding north of Keokuk to U. S. Highway 61), which will be a four-lane divided highway but without access control.

The IDOT does have a program for the construction of Arterial Highway 518 as a four-lane divided highway with access control from Arterial Highway 520 in Black Hawk County to state highway 3 in Bremer County after 1984. The IDOT has no specific plans for any further improvement of Arterial Highway 518 north of state highway 3 in Bremer County.

### Plaintiffs' Claim and General Legal Principles

It is plaintiffs' claim that the final EIS for construction of this 47.6 mile segment of I–380 does not meet and therefore violates the requirements of NEPA and its effectuating administrative regulations. Plaintiffs base this claim upon three basic contentions which, in summary, are as follows: (1) the EIS fails to analyze or insufficiently analyzes the "cumulative impacts" of constructing this segment in conjunction with other proposed or planned road projects; (2) the EIS fails to analyze or insufficiently analyzes all the "reasonable alternatives" to construction of this segment; and (3) the EIS fails to analyze or insufficiently analyzes the "likely secondary impacts" of constructing this segment.

Before considering each of these basic contentions, some legal principles, applicable generally to court review of the adequacy of an EIS, should be stated.

It must be emphasized that the advisability of constructing an *interstate* highway, or the desirability of using a diagonal rather than a right angle or some other route, are not issues here. These involve substantive administrative decisions for the responsible government agencies to make, not the courts. *Compare, e. g., Daly v. Volpe*, 514 F.2d 1106, 1109–10 (9th Cir. 1975); *Iowa Citizens for Environmental Quality, Inc. v. Volpe*, No. 72–17–1, 3 Envir. L.Rep. 20013, 20014 (ELI) (S.D.Iowa 1972), *aff'd* 487 F.2d 849, 851 (8th Cir. 1973). Courts are not empowered under NEPA to substitute their substantive judgment for that of the agency. *See, e. g., Iowa Citizens, supra*, 487 F.2d, at 851, *citing Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). The issue here is simply whether the specific EIS, upon which the agencies in part based their decision to build this 47.6 mile segment as a diagonally axised interstate highway, was procedurally adequate in view of the environmental policy requirements imposed by NEPA. The decisional balancing of environmental goals and policies with other important national interests, (in this case, the linking of major urban centers by means of a national interstate highway system, *see* 23 U.S.C. § 101 *et seq.*) is entrusted by Congress to the administrative decisionmakers. *Compare, e. g., Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 555, 558, 98 S.Ct. 1197, 1217, 1219, 55 L.Ed.2d 460 (1977); *Daly v. Volpe*, 514 F.2d 1106, 1110 (9th Cir. 1975); *Iowa Citizens for Environmental Quality, Inc. v. Volpe, supra*, 3 Envir.L.Rep., at 20014–15; *Environmental Defense Fund, Inc. v. Corps of Engineers*, 342 F.Supp. 1211, 1217 (E.D.Ark.1972).

The purpose of an EIS is to provide a *basis* for agency consideration of environmental factors in deciding whether to approve a proposed project and a *basis*

---

**8.** That segment of 518 was the subject of the Indian Lookout Alliance lawsuit. *See Indian Lookout Alliance v. Volpe*, 484 F.2d 11 (8th Cir. 1973), *remanding for modification of the district court's order, published at* 345 F.Supp. 1167 (S.D.Iowa 1972).

for critical evaluation by those not associated with the agency. *See, Iowa Citizens for Environmental Quality, Inc. v. Volpe,* 487 F.2d 849, 851 (8th Cir. 1973) (emphasis added). In reviewing the adequacy of the EIS under NEPA, the court must evaluate it as a whole in light of the particular facts and circumstances surrounding the particular project. *Id.,* 487 F.2d, at 852. A standard of reasonableness is to be applied. *Id.*

". . . 'The extent of detail required must necessarily be related to the complexity of the environmental problems created by the project.' The discussion of environmental effects need not be 'exhaustive' but rather need only provide sufficient information for a 'reasoned choice of alternatives.' "

*Id. See also Jackson County v. Jones,* 571 F.2d 1004, 1008 (8th Cir. 1978); *Environmental Defense Fund, Inc. v. Hoffman,* 566 F.2d 1060, 1067 (8th Cir. 1977).

In applying this general standard of reasonableness, the reviewing court may consider not only the final EIS itself, but also the draft EIS, background studies, hearing transcripts, and relevant affidavits and documents. *Jackson County, supra,* 571 F.2d, at 1008.

With these general principles in mind, the court now considers the specifics of plaintiffs' claim of EIS inadequacy.

*Cumulative Impacts Analysis*

Plaintiffs contend that the EIS is inadequate as to any analysis of cumulative impacts in three respects.

First, they argue that since all the segments of the entire I–380 project connecting Cedar Falls and the existing I–80 near Iowa City allegedly "were planned together, share a common geographical area, and have little or no utility in the absence of each other," the EIS for this 47.6 mile segment should have included a programmatic analysis of the "cumulative impacts" of constructing the entire I–380 project.

Second, plaintiffs argue that since I–380 allegedly was originally planned as part of the Arterial Highway 518 system extending from Keokuk to the Minnesota border and

allegedly is the only direct link between the northern and southern segments of the 518 system sharing with it a common geographical corridor, it therefore forms an integral part of that Arterial Highway system. As such, plaintiffs argue that the EIS should have included analysis of the cumulative impacts of constructing the I–380 project, including this 47.6 mile segment, in conjunction with the 518 project.

Finally, plaintiffs contend that the EIS for this 47.6 mile segment is inadequate because it fails to analyze the interrelationship and cumulative impacts of constructing this project in conjunction with plans to widen portions of existing highway U. S. 218 and to construct a "north-south Expressway" along the corridor of existing state highway 150.

In answer, defendants concede that the EIS does not specifically include cumulative impacts analysis as specified by plaintiffs but contend that any such analysis, which would in effect extend beyond the scope of the specific project proposal, is not required by NEPA and therefore failure to include such analysis does not make the EIS inadequate.

"Ever since the National Environmental Policy Act (NEPA) became law in 1970, courts have wrestled with the problem of determining which federal activities are subject to the Act's environmental impact statement (EIS) requirement. Courts have had difficulty determining when the provision demands a broadly based EIS evaluating a general federal policy or program rather than a narrowly drawn EIS tailored to a single project. The lack of a workable standard has led to ambiguous, and apparently conflicting, judge-made rules about the timing and scope of an EIS."

J. Koshland, *Note, The Scope of the Program EIS Requirement: The Need for a Coherent Judicial Approach,* 30 Stan.L.Rev. 767, 767 (1978) (footnotes omitted).

■ The court accepts plaintiffs' contention that NEPA may require a comprehen-

sive or programmatic EIS for certain broad-based federal action. *See, e. g., Kleppe v. Sierra Club*, 427 U.S. 390, 409, 96 S.Ct. 2718, 2730, 49 L.Ed.2d 576 (1976). The problem, however, is delineating the proper scope of the action to be included in any such EIS. *E. g., id.* Moreover, unless it can be shown that defendants acted unreasonably, *Minnesota PIRG v. Butz*, 498 F.2d 1314, 1319–20 (8th Cir. 1974), or at least arbitrarily, *Kleppe, supra*, 427 U.S., at 412, 96 S.Ct., at 2731, in not preparing a programmatic comprehensive EIS, their decision not to do so cannot be disturbed. *Id.*

█ It is the court's view generally that the proposed construction of I–380 from Blairs Ferry Road in Cedar Rapids to the 218/520 intersection in Waterloo is such that it does not require one comprehensive, programmatic impact statement of a scope exceeding the 47.6 mile segment proposal.

To resolve the issue presented here the court must begin with the United States Supreme Court decision in *Kleppe v. Sierra Club*, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). There, the court indicated that the kind of impact statement required depends on the kind of federal action actually being formally proposed. *Id.*, at 401–02, 96 S.Ct. at 2726. The fact that a variety of similar actions are planned or "contemplated" is not sufficient to require a program EIS. *Id.*, at 403–04, 96 S.Ct. at 2727. This is true even where the "contemplated", but not yet proposed, actions are interrelated. *Id.*, at 408–10, 96 S.Ct. at 2729–30.

This Supreme Court standard would appear to address plaintiffs' specific contentions that the EIS here should have included some comprehensive analysis of the cumulative impact of constructing I–380 together with plans to construct Arterial Highway 518 and to alter or widen existing highways presently connecting Cedar Rapids and Waterloo. Although the record indicates that some plans do exist with respect to parts of Arterial Highway 518 and with respect to presently existing U. S. Highway 218 and state highway 150, there is no evidence that such plans as yet constitute formal proposals for major federal ac-

tion pending concurrently before these defendant agencies. As such, the court cannot conclude that NEPA requires the EIS at issue here to include a programmatic analysis of constructing I–380 along with Arterial Highway 518 or upgrading of other roads in the Cedar Rapids-Waterloo area. *Compare Indian Lookout Alliance v. Volpe*, 345 F.Supp. 1167, 1169–70 (S.D.Iowa 1972), *rev'd and remanded on other grounds*, 484 F.2d 11 (8th Cir. 1973).

Moreover, in light of FHWA practice in approving and funding state highway plans, *see, e. g., Indian Lookout, supra*, 484 F.2d, at 15–16 & nn.6–10, the court cannot view construction of this 47.6 mile I–380 segment as integrally related to any plans for constructing Arterial Highway 518 or for upgrading existing highways. *Compare Sierra Club v. Calloway*, 499 F.2d 982, 987 (5th Cir. 1974).

Finally, considerations relating to "major purposes" and "independent utility" argue against the need for a programmatic EIS analysis. *See* discussion of these latter factors at pp. 607–608, *infra*.

In light of these circumstances and the record as a whole, the court concludes that defendants were not arbitrary or unreasonable in limiting their EIS to an analysis of the impacts directly resulting only from this 47.6 mile segment of I–380. *Compare, Indian Lookout, supra*, 484 F.2d 11 (8th Cir. 1973).

A more difficult review problem is presented by plaintiffs' contention that this EIS should have incorporated a programmatic analysis of the impacts resulting from construction of the entire I–380 project from I–80 through to Cedar Falls. This is because the entire I–380 project arguably involved formal proposals for major federal action pending concurrently before the agencies. In such situations, however, further factors must be considered in deciding whether a segmental as opposed to programmatic EIS was unreasonable under the circumstances. Such factors include consideration of the major purposes for the project segment at issue, and whether the segment has independent utility. *See, e. g.,*

*Sierra Club v. Calloway,* 499 F.2d, at 987; *Indian Lookout Alliance v. Volpe, supra,* 484 F.2d, at 19–20; *Movement Against Destruction v. Volpe,* 361 F.Supp. 1360, 1384–85 (D.Md.1973).

It is true that one result of constructing this 47.6 mile segment of I–380 would be to link the Waterloo urban center with I–80 and the rest of the national interstate highway system, since the southern portions of I–380 extending from Cedar Rapids to I–80 are already constructed. But it is also true that this 47.6 mile segment would primarily serve to connect the Waterloo and Cedar Rapids urban centers. Indeed, the EIS indicates that a major purpose of this 47.6 mile proposal is to connect Cedar Rapids and Waterloo. EIS, at p. 4. As such the 47.6 mile segment would have independent utility since it connects logical termini. *Compare, e. g., Indian Lookout, supra,* 484 F.2d, at 18–19.[9]

To that extent, this court's decision in *Smeltzer v. Adams,* No. 77–3011, 8 Envir.L. Rep. 20221 (ELI) (N.D.Iowa 1978), upon which plaintiffs rely, is distinguishable. There, the EIS at issue was addressed to a 21 mile segment of "Freeway 520" commencing "300 feet east of U. S. Highway 20 . . . and connecting to the main portion of the freeway [then] completed to the east. . . ." *Id.,* at 20222. It did not even reasonably pretend to connect logical termini such as cities or major highways. It's sole purpose was to fill a gap existing in Freeway 520 extending the entire width of the State of Iowa. As such, it constituted a clear example of "piecemealing" and clearly had no utility independent of the entire Freeway 520 project. This court, therefore,

viewed the preparation of a more programmatic EIS to be the more proper and feasible course in light of NEPA and the circumstances surrounding that particular project. The situation here is much different. The court is not confronted with a clear example of piecemealing as it was in *Smeltzer.* The stated purpose of connecting two urban centers and the existence of independent utility, therefore, argues strongly against requiring in this case a programmatic analysis of segments extending beyond the 47.6 mile proposal.

In conclusion, the court cannot view defendants' decision to limit EIS analysis to the 47.6 mile segment as either arbitrary or unreasonable under the circumstances.

### Alternatives Analysis

It is plaintiffs' second major contention that the EIS is inadequate in that it (1) insufficiently analyzes the "no action" alternative; (2) fails to analyze the alternative of constructing this segment to standards different from or less than full limited-access interstate highway standards; and (3) fails to analyze the alternative of upgrading existing roads in order to serve projected transportation needs.

In answer, defendants deny that the "no action" alternative analysis is insufficient. They further contend that this project proposal can legally only be constructed to full interstate highway design standards. As such, they argue that any alternatives involving different or lesser design standards, or the upgrading of existing roads, would not be reasonably feasible with respect to the particular proposal and are not, there-

---

9. Moreover, the regulations promulgated to effectuate NEPA with respect to highway construction projects indicate that the proper scope of an EIS on a highway project is that between logical termini such as major crossroads, population centers, and major traffic generators. *See, e. g., Indian Lookout, supra,* 484 F.2d, at 18; 23 CFR § 771.3(g) (1977). The responsible agencies themselves clearly have authority to establish their own regulations and procedures for properly implementing NEPA's EIS requirements. *Vermont Yankee, supra,* 435 U.S., at 543, 98 S.Ct. at 1211. Plaintiffs do not challenge this regulatory definition and in-

deed this court should grant deference to such administrative definitions absent some indication that they otherwise violate legal strictures. *See, e. g., Vermont Yankee, supra,* 435 U.S., at 546–47, 98 S.Ct., at 1213. The fact that this 47.6 mile segment connects population centers and accords with FHWA regulations supports defendants' contention that it has independent utility. To that extent, the EIS here, though limited to analysis of this particular segment, comports with NEPA and the FHWA regulations effectuating NEPA, and was not arbitrarily or unreasonably drafted.

fore, required to be included in this EIS in light of NEPA *and* the federal highway laws.

The court notes that the proposed federal action in this case was to build an interstate link between Waterloo and Cedar Rapids and was a committed project as of June 17, 1974. *See,* EIS at p. 4; defendants' brief at pp. 22–26. The area involved in any selected route between these two points is the same—tillable farmland. Of the alternative finally selected—the "Raymond" alternative—the greatest impacts would be the environmentally adverse effect on farming caused by diagonal severance and the effect of constructing a divided four-lane controlled access highway across tillable farmland. *Compare, Iowa Citizens For Environmental Quality, Inc. v. Volpe,* No. 72–17–1, 3 Envir.L.Rep. 20013, 20014 (S.D.Iowa 1972), *aff'd* 487 F.2d 849 (8th Cir. 1973). Under these circumstances, the feasible alternatives available to defendants are bounded by federal laws and regulations. 23 U.S.C. § 109(b); 23 CFR § 625.3(a)(3).

Eight alternatives, including the "no action" alternative, were discussed in the EIS. Discussion of the various alternatives included their respective probable impacts, and was supplemented by appropriate maps, tables and graphs.

Plaintiffs first contend that the discussion of the "no action" alternative, involving two paragraphs in the final EIS (*see* EIS at p. 62), was inadequate. The court is of the opinion, however, that the paginal length of an alternatives discussion is not in itself controlling. Furthermore, it should be noted again that an EIS need not be exhaustive or inordinately detailed. *Iowa Citizens for Environmental Quality, Inc. v. Volpe,* 487 F.2d 849, 852 (8th Cir. 1973). It need only be sufficient to serve as a *basis* for consideration of the environmental impacts of the various reasonably feasible alternatives available. *Id.,* at 851. *See, Vermont Yankee Nuclear Power Corp. v.*

*NRDC,* 435 U.S. 519, 551, 98 S.Ct. 1197, 1215, 55 L.Ed.2d 460 (1977).[10] The court cannot conclude, therefore, that the two paragraph discussion of the no action alternative was arbitrary or unreasonable under the circumstances involved. *Compare, Vermont Yankee, supra,* at 549–55, 98 S.Ct. at 1214–17.

Plaintiffs further contend that the EIS is inadequate because it did not discuss any alternatives involving a "more limited design" construction or alternatives involving the upgrading of existing roadways in the area. The fact is, however, that the proposal actually pending before the responsible agencies at the time was to construct an *interstate* highway. The federal laws and regulations mandate the design specifications for interstate highways. *See,* 23 U.S.C. § 109(b); 23 CFR § 625.3(a)(3); AASHO standards (defendants' exhibit 1). If the "more limited design" or "upgrading of existing roadways" alternatives were to be selected, in effect that would require selection of the "no action" alternative for the interstate highway proposal then actually pending. Moreover, the fact that federal laws and regulations specify the design standards for interstate highways indicates that any alternative involving a more limited design or upgrading of existing roadways would not be available or otherwise practically feasible under the circumstances. *Compare, Vermont Yankee, supra,* at 551, 98 S.Ct. at 1215. Indeed, any suggestion to construct such "non-interstate" alternatives would constitute a totally separate and independent highway construction proposal not pending before the responsible agencies.

Additionally, at public hearings held upon this project the very alternatives suggested here by the plaintiffs were brought to the responsible agencies' attention and were considered, *see, e. g.,* defendants' exhibit 5, at pp. 26–31, 35–36, 39–61; defendants' exhibit 6, at pp. 33–36; defendants' exhibit 7,

---

**10.** "But, as should be obvious even upon a moment's reflection, the term 'alternatives' [in NEPA, 42 U.S.C. § 4332(c)] is not self-defining. To make an impact statement something more than an exercise in frivolous boilerplate the concept of alternatives must be bounded by some notion of feasibility." 435 U.S., at 551, 98 S.Ct., at 1215.

at pp. 26–32, 37–40, although ultimately rejected. Thus, the EIS did, as a practical matter, serve as a *basis* for consideration of the very alternatives suggested by plaintiffs even though the EIS did not specifically include discussion of them between its covers. In effect, this EIS was adequate for purposes of considering the environmental impacts of the alternatives suggested by plaintiffs.

The court emphasizes again that it is not its function to substitute its substantive judgment for that of the responsible agencies with respect to what alternative should have been selected as the "best". *Vermont Yankee, supra,* 435 U.S., at 555, 98 S.Ct., at 1217. The substantive balancing of environmental against other important national goals and policies is the discretionary function of the administrative decisionmakers. The court views plaintiffs' contentions with respect to alternatives to constitute an invitation for the court to substitute its substantive decision for that already made by defendants. As such, the court must, of course, decline.

In conclusion, the court finds the EIS' discussion of alternatives not unreasonable in light of the circumstances surrounding the action actually pending before the responsible agencies; which include the interstate highway design requirements imposed by federal laws and regulation, and the content of public hearings held for purposes of deciding what alternative should be selected. *See, Vermont Yankee, supra,* 435 U.S., at 549–55, 98 S.Ct. at 1214–17; *Environmental Defense Fund, Inc. v. Hoffman,* 566 F.2d 1060, 1071–72 (8th Cir. 1977); *Iowa Citizens for Environmental Quality, Inc. v. Volpe,* 487 F.2d 849, 852–53 (8th Cir. 1973).

### Secondary Impacts Analysis

■ It is plaintiffs' third and final major contention that the EIS is inadequate because it (1) does not analyze whether likely secondary effects such as commercial, industrial and residential development would be consistent with local land use plans; and (2) fails to analyze or insufficiently analyzes the effect likely secondary impacts would have on existing agricultural land uses.

In answer, defendants allege that the EIS adequately discusses all relevant secondary impacts, and deny that it must include analysis of such secondary impacts with the specificity asserted by plaintiffs.

■ Concededly the EIS must discuss significant secondary impacts of constructing the project as proposed. *City of Davis v. Coleman,* 521 F.2d 661, 676 & n.18 (9th Cir. 1975). The court disagrees, however, with plaintiffs' contention that this EIS inadequately discusses such secondary impacts.

The EIS recognizes that I–380 is expected to exert an influence on the economic and population growth of the towns along the route as well as Cedar Rapids and Waterloo (EIS, at p. 10); that commuter traffic is expected to result as population increases (p. 13); and that there will be related economic growth for smaller towns near this new I–380 (p. 13). It recognizes that "present and future land use in the I–380 corridor is determined largely by the suitability of the area's soils to agricultural use" (pp. 19, 19–22); and that "with a continuing increase in population, more land will be utilized by residential needs and industrial needs; however, the land use will remain in profitable agricultural production" (p. 22). The EIS notes that the continuation of I–380 from Cedar Rapids to Waterloo is compatible with the plans of the Linn County Regional Planning Commission and the Metropolitan Planning Commission of Black Hawk County (pp. 13, 39a, 69–70). The EIS balances these effects with recognition that with the I–380 project commuter traffic will have safer, more comfortable and more efficient travel, and local business and industry will gain from enhanced freight transport and increased efficiency in the distribution of locally manufactured goods via the interstate system (pp. 31–32).

The EIS also recognizes that "land use within the corridor would be influenced by the presence of an interstate highway; however, land use adjacent to the right-of-way throughout most of its length would be expected to remain largely agricultural as it is today" (p. 32). It notes that "commercial development could be predicted on lands

adjacent to interchanges and also along the urban fringes of the two metropolitan termini" (p. 32). The EIS further recognizes that proper planning by local planning and zoning boards would guide or control the actual use of lands adjacent to this project (pp. 32, 39a).

Finally, the EIS states that the direct effect on the land in the area will be the removal of high quality agricultural land (pp. 1, 4, 31, 36, 39a, 71); diagonal severance, which will create difficulties involving modern row-crop farming methods (pp. 31, 38, 29a, 49); dislocations (pp. 31, 35, 36, 105–108); that approximately ¼ of the 1650 acres of farmland converted to interstate highway right-of-way would actually be occupied by roadway surfaces with the remainder to be seeded and maintained as green roadside areas (pp. 33, 114); that cropland will be separated from farmhouses by the interstate with possible devaluations of the farmland but with compensation procedures to adequately remedy the situation (p. 49); that drainage facilities including tile lines would be adapted to the conformation of the interstate roadway (p. 108); local road closures (p. 113); and that noise and air pollution will occur (pp. 117–129).

In view of such discussion of secondary impacts, the court cannot conclude that the EIS was inadequate to serve as a basis for consideration of likely adverse environmental effects. Again, the court emphasizes that the EIS need not be detailed or completely exhaustive. *Iowa Citizens for Environmental Quality, Inc. v. Volpe*, 487 F.2d 849, 852 (8th Cir. 1973). It need only be a reasonable document under the circumstances. For support of this view, *compare Environmental Defense Fund, Inc. v. Hoffman*, 566 F.2d 1060, 1067–69 (8th Cir. 1977); *Minnesota PIRG v. Butz*, 541 F.2d 1292, 1300 (8th Cir. 1976).

*Conclusion*

The court concludes generally, therefore, that the EIS at issue here did adequately meet the requirements of NEPA; and that plaintiffs' prayer for declaratory, injunctive and mandamus relief should be denied.

It is therefore

ORDERED

1. Plaintiffs' motion for summary judgment denied.

2. Defendants' and intervenor-defendants' motions for summary judgment granted.

3. The Clerk of Court shall enter judgment in favor of defendants and intervenor-defendants.