An appropriate Order will issue.

The **PIEDMONT ENVIRONMENTAL COUNCIL** and **Sierra Club**, Plaintiffs,

v.

**UNITED STATES DEPARTMENT OF TRANSPORTATION, et al., Defendants.**

No. Civ.A. 3:98CV0004.

United States District Court, W.D. Virginia, Charlottesville Division.

Aug. 21, 2001.

264

Deborah M. Murray, Southern Environmental Law, Charlottesville, VA, for Plaintiff.

Julie C. Dudley, U.S. Attys. Office, Roanoke, VA, for Defendants.

OPINION

MOON, District Judge.

This action, filed by the plaintiffs under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and Section 4(f) of the Department of Transportation Act ("Section 4(f)"), 49 U.S.C. § 303, 23 U.S.C. § 138, is currently before the Court on cross motions for summary judgment. The parties have submitted an administrative record, and the Court has ruled on motions relating to that record. There are no genuine issues of material fact in this case, and both sides contend that they are entitled to judgment as a matter of law. As a result, this matter is ripe for disposition. For the reasons that follow, the Court will grant the defendants' motion for summary judgment in part and will deny it in part. In addition, the Court will deny the plaintiffs' cross motion for summary judgment in part and grant it part. As a result, the Court will enjoin further action by the defendants with regard to the bypass project until a supplemental environmental impact statement addressing the specific issues enumerated in this memorandum opinion has been completed.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

This lawsuit stems from the proposed construction of a western bypass of Route 29 around the City of Charlottesville and through Albemarle County, Virginia. The bypass, as presently proposed, will be a four-lane, 6.2 mile highway running to the west of the current Route 29. The southern terminus of the bypass will be placed approximately 0.7 miles north of the Route $^{29}\!/_{250}$ interchange, and the northern terminus will be approximately 0.5 miles north of the South Fork of the Rivanna River. The project will also entail the building of a connector road into the North Grounds of the University of Virginia, located on the south side of the existing Route $^{29}\!/_{250}$ bypass. As currently contemplated, access to the bypass will be via the interchanges at both ends, with no intermediate access points to crossroads or adjacent properties.

The bypass project, in its present form, is the product of many years of study, planning, and debate over the best means of alleviating traffic congestion on the Route 29 corridor through the Charlottesville area. Over the years, various improvements have been suggested, with the principal propositions including a widening of the existing highway, construction of an expressway along the present highway corridor, and construction of bypasses of various configurations. In 1986, the Federal Highway Administration ("FHWA") approved a draft Environmental Assessment ("EA") for widening Route 29. At the time of the draft EA, Route 29 consisted of four lanes with a graded median. The widening project was to entail expansion of the road to six lanes, in addition to continuous right-turn lanes, between the Route 250 bypass and the South Fork of the Rivanna River. In 1991, the Virginia Department of Transportation ("VDOT")

submitted a final EA to the FHWA, and the FHWA issued a finding of no significant impact ("FONSI") with regard to the widening project. This widening of Route 29 came to be known as the Base Case, and will be referred to as such in this memorandum opinion.

In 1986, Albemarle County representatives asked VDOT to evaluate the possibility of building an expressway along the existing Route 29 corridor. Local officials and citizens of the area recommended that VDOT hold construction of the Base Case improvements in abeyance until the completion of a comprehensive study of the Route 29 corridor in Albemarle County north of Charlottesville. In 1987, VDOT selected a consultant to conduct the study, which lasted from 1987 to 1993. The study included analyses of traffic volumes and patterns, as well as evaluations of various alternatives, including expressway concepts.

The alternatives determined to be reasonable were documented in a draft EIS ("DEIS"), which was approved by the FHWA in 1990. Among the alternatives chosen to be discussed in the DEIS were the Base Case, the Base Case plus three grade separated interchanges, mass transit and transportation system management strategies, seven bypass alternatives of various alignments, and an expressway. The Base Case served as the "no build" alternative for the DEIS. The DEIS discussed various environmental and socioeconomic impacts presented by the different alternatives, and it also evaluated the potential effects of the alternatives on Section 4(f) resources such as public parks, recreation areas, wildlife refuges, and historic sites. The DEIS was distributed to numerous state and federal agencies, and was made available to the public.

On November 15, 1990, after considering the DEIS and public comments thereon,

the Commonwealth Transportation Board ("CTB") selected a combination of alternatives for the Route 29 corridor. According to the CTB's resolution, the selected improvements were to be implemented in three phases in order to address short, medium, and long-range needs. During Phase I of the project, the CTB resolved to construct the Base Case improvements, to reserve rights of way for the future construction of interchanges at Rio Road, Greenbrier Drive, and Hydraulic Road, to approve the Alternative 10 western bypass corridor for future development, and to begin the process of securing rights of way for the bypass corridor. The CTB next resolved that Phase II of the project would be the construction of grade-separated interchanges at Rio Road, Greenbrier Drive, and Hydraulic Road, along with continued preservation of the right of way for the bypass. Finally, the CTB resolved that Phase III of the project would consist of the construction of the western bypass.

In 1992, the City of Charlottesville, the County of Albemarle, and the University of Virginia responded to the CTB's resolution by signing an agreement (the "Three–Party Agreement") supporting the improvements chosen by the CTB and making other suggestions, such as building the Meadowcreek Parkway prior to the grade-separated interchanges on Route 29. The Three–Party Agreement also requested that Charlottesville–Albemarle Metropolitan Planning Organization ("MPO") amend the Charlottesville Area Transportation Study ("CATS") to reflect the priorities set forth in the resolution. The MPO amended the CATS plan on February 18, 1992 as per the request made in the Three–Party Agreement.

On January 20, 1993, FHWA approved the final EIS for the Route 29 corridor study, which evaluated the alternatives considered and explained the reasoning behind the "combination of improvements" selected. The final EIS also included a final Section 4(f)/106 evaluation. On April 8, 1993, FHWA issued a record of decision ("ROD"), which selected a "combination of improvements to be implemented over a number of years in three phases to serve immediate, medium range and long-term transportation needs." To address the long-term needs, the ROD adopted the Alternative 10 bypass, as modified to eliminate the proposed interchanges at Route 654 and Route 743. As for medium range needs, the ROD selected the construction of the grade separated interchanges at Hydraulic Road, Rio Road, and Greenbrier Drive. Finally, the ROD stated that immediate needs would be met by construction of the Base Case improvements. The ROD also briefly described the Section 4(f) evaluation process and concluded that the Alternative 10 bypass was "the only feasible and prudent alternative which avoids impacts to Section 4(f) properties."

After the Final EIS and ROD had been issued, it was proposed that the location of the southern terminus of the bypass be shifted from the west side to the east side of St. Anne's Belfield School and that the northern terminus be moved to the north side of the South Fork of the Rivanna River. The FHWA determined that an EA should be prepared to determine whether a supplemental EIS would be needed for the modifications. VDOT then solicited comments from various local, state, and federal entities on the proposed changes to the termini. In 1994, the FHWA approved a draft EA, and the document was later made available to the public. In March 1995, the CTB approved the changes to the bypass termini. Thereafter a final EA was completed, which identified no significant environmental impacts resulting from the modifications; therefore, FHWA issued a FONSI for the termini changes on July 6, 1995.

In October 1994, a public information meeting was held to discuss the design of the grade separated interchanges to be constructed as Phase II of the Route 29 project. At the meeting, many citizens, a great number of whom represented the business community, expressed opposition to the interchanges being built at all. In fact, of the 4,372 citizens who submitted comments during or after the meeting, 3,270 opposed the construction of any of the interchanges, and 2,297 of those individuals recommended that the western bypass be constructed in lieu of the interchanges. VDOT also received correspondence requesting that the interchange phase be abandoned in favor of proceeding with the construction of the bypass. In January 1995, the City of Charlottesville passed a resolution requesting that the interchange at Hydraulic Road be abandoned. In addition, those in favor of the interchanges also voiced their opinions on the subject. On February 16, 1995, the CTB passed a resolution terminating the design and development of the interchanges and assigning the funds allocated to the interchange study to Base Case improvements and bypass development.

In 1995 and 1996, several changes to the design of the Alternative 10 bypass were proposed, and VDOT and FHWA determined that these proposals made it necessary to reevaluate the previous environmental documents prepared in connection with the project. The process of compiling a written Reevaluation was begun in October 1996. After the commencement of the Reevaluation, several design and environmental issues arose. For instance, in 1997, the CTB instructed VDOT to modify the design of the interchange at the northern terminus of the bypass in order to avoid affecting Brook Hill, an historic property that was not previously taken into account. The CTB also ordered design changes to the connector road to the North Grounds of the University of Virginia. In addition, further study was conducted on the noise and archaeological impacts of an alteration to the bypass's design at Stillhouse Mountain. FHWA also entered into a formal consultation with the U.S. Fish and Wildlife Service ("USFWS") based on new information received concerning the James spinymussel, an endangered species. VDOT also continued to evaluate bypass design in light of concern over risk to the South Fork Rivanna River Reservoir. In addition, new issues concerning the bypass project were raised in January 1998 when this lawsuit was filed. The Reevaluation examined these changes, and concluded that the changes and new issues resulted in no new significant impacts that would necessitate the completion of a new or supplemental EIS. FHWA approved and signed the Reevaluation on March 13, 2000.

In addition to the NEPA issues brought to light by the plaintiffs' lawsuit, the complaint also pointed out Section 4(f) concerns, specifically with regard to the Albemarle County School Complex (the "School Complex"). Subsequently, VDOT and FHWA conducted a new Section 4(f) evaluation, treating the entire School Complex as a Section 4(f) property. On March 13, 2000, FHWA approved the final Section 4(f) Evaluation, which concluded that there is no feasible and prudent alternative to using a portion of the property of the School Complex. On that same day, FHWA issued a new ROD that documented its decision to deviate from the original ROD by selecting the Base Case improvements (which had already been completed) and the Alternative 10 bypass.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment should only be granted if, viewing the record as a whole

in the light most favorable to the non-moving party, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Terry's Floor Fashions, Inc. v. Burlington Indus., Inc.*, 763 F.2d 604, 610 (4th Cir.1985). However, in a case such as this, where the Court is reviewing the decision of an administrative agency, a motion for summary judgment "stands in a somewhat unusual light, in that the administrative record provides the complete factual predicate for the court's review." *Krichbaum v. Kelley*, 844 F.Supp. 1107, 1110 (W.D.Va.1994), *aff'd*, 61 F.3d 900 (4th Cir.1995) (unpublished table decision). Because the Court's review is restricted to the administrative record and limited supplements thereto, the movant's "burden on summary judgment is not materially different from his ultimate burden on the merits." *Id.* As a result, in order to prevail by summary judgment, the parties "must point to facts in the administrative record—or to factual failings in that record—which can support [their] claims under the governing legal standard." *Id.*; *see generally Shenandoah Ecosystems Def. Group v. United States Forest Serv.*, 144 F.Supp.2d 542, 2001 WL 515062, at *3 (W.D.Va.2001) (explaining the atypical role played by motions for summary judgment in an administrative review case).

### III. STANDARD OF REVIEW UNDER THE APA, NEPA, AND SECTION 4(F)

This Court's review of the defendants' actions is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. Thus, the Court may overturn a decision made by the agencies only if the administrative record reveals that the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In making this determination, the Court must determine "whether the decision was based on a consideration of all the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). Furthermore, although the Court's "inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id.*

NEPA declares a national policy in favor of the protection and promotion of environmental quality. *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 443 (4th Cir.1996) (citing 42 U.S.C. §§ 4321, 4331(a)). NEPA implements this policy by requiring that federal agencies follow the statute's procedures before and during the undertaking of projects that will affect the environment. *See id.* As a result, "although NEPA establishes environmental quality as a substantive goal, it is well settled that NEPA does not mandate that agencies reach particular substantive results." *Id.* As explained by the Supreme Court, the substantive goals of NEPA "are thus realized through a set of 'action forcing' procedures that require that agencies 'take a "hard look" at environmental consequences.'" *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976)); *see also id.* ("If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs.").

A central component of NEPA's procedure is the requirement that federal agencies prepare an environmental impact statement ("EIS") with regard to "every recommendation or report on proposals for ... major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The completion of an EIS does not, however, put an end to an agency's duties under NEPA, for the statute also requires that agencies take a "hard look at the environmental consequences of their proposed projects even after an EIS has been prepared." *Hughes River*, 81 F.3d at 443. Thus, agencies must undertake a supplemental EIS ("SEIS") "when '[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.'" *Id.* (quoting 40 C.F.R. § 1502.9(c)(1)(ii)). According to the Fourth Circuit, however, not every new circumstance that arises during the course of a project requires the completion of a SEIS; instead, "'the new circumstance must present a *seriously* different picture of the environmental impact of the proposed project from what was previously envisioned.'" *Hickory Neighborhood Def. League v. Skinner*, 893 F.2d 58, 63 (4th Cir.1990) (quoting *Sierra Club v. Froehlke*, 816 F.2d 205, 210 (5th Cir.1987)). Thus, in reviewing the defendants' decisions in this case to determine whether NEPA's procedural requirements were observed, the Court must engage in a two-part inquiry. First the Court must look to the administrative record to determine whether the agency took a hard look at the environmental consequences of the project and the subsequent changes thereto. Then, if the agency took the requisite hard look, the Court must determine whether the agency's decision was arbitrary and capricious. *See Hughes River*, 81 F.3d at 443.

Section 4(f) forbids the Secretary of Transportation from approving a highway project that requires the "use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State or local significance, or land of an historic site of national, State or local significance," unless "(1) there is no prudent and feasible alternative to using that land; and (2) the program or project includes all possible planning to minimize harm to the park, recreational area, wildlife and waterfowl refuge, or historic site resulting from the use." 49 U.S.C. § 303(c). According to the Supreme Court, in reviewing a decision to determine whether it complied with Section 4(f), a Court must engage in a "substantial inquiry." *Overton Park*, 401 U.S. at 415, 91 S.Ct. 814 (noting that, although the Secretary's decision is "entitled to a presumption of regularity," said presumption "is not to shield his action from a thorough, probing, in-depth review").

As set forth in *Overton Park*, the reviewing Court must conduct a three-part inquiry with regard to a claim under Section 4(f). *See id.* at 415–17, 91 S.Ct. 814. First, the Court must "decide whether the Secretary acted within the scope of his authority." *Id.* at 415, 91 S.Ct. 814. As to this prong, the Court "must be able to find that the Secretary could have reasonably believed that in this case there are no feasible alternative or that alternatives do involve unique problems." *Id.* at 416, 91 S.Ct. 814. Next, the Court must determine whether the Secretary's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See id.* (quoting 5 U.S.C. § 706(2)(A)). Finally, the Court must determine "whether the Secretary's action followed the necessary procedural requirements." *Id.* at 417, 91 S.Ct. 814. With the foregoing principles in mind, the Court will now address the merits of the plain-

tiffs' claims under NEPA and Section 4(f). Although the Court will address each count of the complaint separately for the sake of clarity, the Court's treatment of each claim should not be viewed in complete isolation, for treatment of one claim may have bearing on other, similar claims.

## IV. DISCUSSION

The plaintiffs' complaint sets forth nine separate counts alleging various violations of NEPA and Section 4(f). The Court will address each of the counts in the plaintiffs' complaint in turn; however, before doing so, the Court must first address the issue of whether certain documents in the administrative record, as well as other documents submitted as supplements to that record, should be disregarded on account of their being mere "post hoc justifications" for the decisions made by the defendants.

■ Judicial review of an administrative action typically is confined to the record that was "before the agency at the time the initial decision was made." *Strahan v. Linnon,* 966 F.Supp. 111, 114 (D.Mass. 1997); *accord Fort Sumter Tours, Inc. v. Babbitt,* 66 F.3d 1324, 1335–36 (4th Cir. 1995). Evidence consisting of " 'post hoc' rationalizations" has "traditionally been found to be an inadequate basis for review." *Overton Park,* 401 U.S. at 419, 91 S.Ct. 814; *see also Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) (stating that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); *Citizen Advocates for Responsible Expansion, Inc. v. Dole,* 770 F.2d 423, 434 (5th Cir.1985) (stating that "evidence made or offered after [an agency's] decision ... has been reached to support that decision must be viewed critically and ordinarily cannot constitute part of the administrative record").

■ Nevertheless, courts have allowed the record to be supplemented with outside documents (1) if it appears that the agency relied upon documents not in the record, (2) to illustrate factors that the agency should have considered but did not, (3) to provide background information helpful to an understanding of unclear or technical portions of the record, or (4) if the plaintiff alleges bad faith and provides a reasonable basis in fact for such contention. *See Krichbaum v. United States Forest Service,* 973 F.Supp. 585, 589 (W.D.Va.1997), *aff'd* 139 F.3d 890 (4th Cir. 1998); *Strahan,* 966 F.Supp. at 114. Furthermore, it has been recognized that these exceptions are "particularly important when reviewing a decision under NEPA where a court must determine whether the agency considered all relevant factors." *Krichbaum,* 973 F.Supp. at 589. Ultimately, supplementation of the administrative record under these exceptions is "discretionary with the reviewing court." *Valley Citizens for a Safe Environment v. Aldridge,* 886 F.2d 458, 460 (1st Cir.1989).

A major point of contention in this litigation has been whether and to what extent the Court should consider the March 13, 2000 Reevaluation and accompanying ROD. NEPA requires that a SEIS be prepared when changes or new information emerge during the course of a project that would result in significant environmental impacts. *See* 23 C.F.R. § 771.130(a) (2000). In addition, NEPA regulations require an EA or other "appropriate environmental studies" if the significance of a change or new information is "uncertain." *Id.* § 771.130(c). In order to make the initial determination about whether a change or new information meets the threshold of "significance" or "uncertainty" needed to require fur-

ther environmental documentation, an agency may use "non-NEPA" documents such as the Reevaluation employed by the defendants. *See id.* §§ 771.129, 771.130; *see also Idaho Sporting Congress, Inc. v. Alexander,* 222 F.3d 562, 566 (9th Cir. 2000) (citing cases for the proposition that "courts have upheld agency use of [supplemental information reports] and similar procedures for the purpose of determining whether new information or changed circumstances require the preparation of a supplemental EA or EIS"); *Price Road Neighborhood Ass'n, Inc. v. United States Dep't of Transp.,* 113 F.3d 1505, 1510 (9th Cir.1997) (stating that "[w]hat the [plaintiff] overlooks ... is that the environmental reevaluation was used to make the initial significance determination, not to supplant any documentation that would be required if the threshold were met.").

As explained above, the Reevaluation, which was begun in October 1996 and was completed in March 2000, assesses various changes that occurred after the final EIS was filed in 1993. The Reevaluation reviews changes made in the construction phasing of the project as a whole and in the design of the bypass in particular. The Reevaluation also examines changes in surroundings, changes in impacts, and other new issues and information that arose after the filing of the EIS. In light of these changes and new circumstances, the Reevaluation assesses the earlier environmental documents filed with regard to the project and determines that the current documents are adequate because none of the changes met the threshold for requiring new or supplemental filings under the NEPA regulations.

Thus, in previous memorandum opinion entered December 27, 2000, the Court held that the Reevaluation and ROD should be a part of the administrative record to the extent that the documents reflect the defendants' proper conducting of the decision-making process. However, in admitting the Reevaluation and ROD to the record, the Court recognized the validity of the plaintiffs' argument that "post hoc justifications" should not considered by the Court. As a result, although the Court denied the plaintiffs' motion to exclude the Reevaluation and ROD from the record, the Court stated that it "will not consider the documents to the extent that defendants have used them as a post-hoc justification for the decision made five years earlier to eliminate the interchanges from the bypass project" *Piedmont Envtl. Council v. United States Dep't of Transp.,* 3:98CV0004, slip op. at 4–5 (W.D.Va. Dec. 27, 2000).

■ After having further reviewed the Reevaluation and revised ROD in the context of the parties' cross motions for summary judgment, with one significant exception that will be explained below, the Court is of the opinion that the documents are not "post hoc justifications" for earlier final decisions. Rather, the Reevaluation and revised ROD were a proper means of addressing the significance of changes made to the project. The crux of the plaintiffs' argument on this issue is that the Reevaluation is a post hoc justification for the CTB's decision in February 1995 to abandon the grade separated interchanges in favor of proceeding directly to the construction of the Alternative 10 bypass. However, this argument lacks merit because NEPA's procedural requirements govern *federal* agency action, *see* 42 U.S.C. § 4332, and the CTB's decision to change the project did not represent the final decision of a federal agency. Rather, the revised ROD was the final agency action with regard to the project changes, and the Reevaluation was conducted prior to that decision. *Cf. Jersey Heights Neigh-*

*borhood Ass'n v. Glendening,* 174 F.3d 180, 187 (4th Cir.1999) (noting in the statute-of-limitations context that "designation of the ROD as final agency action under the APA is generally recognized."); *Half Moon Bay Fishermans' Marketing Ass'n v. Carlucci,* 857 F.2d 505, 512 (9th Cir. 1988) (holding in a context analogous to the case at bar that the defendant Corps of Engineers's record of decision represented "their final decision"). Thus, the Reevaluation does not justify the CTB's decision in a post-hoc manner, but instead documents the review process undertaken prior to FHWA's final decision, *inter alia,* to abandon the grade separated interchanges in favor of earlier construction of the bypass.

■ The plaintiffs rely heavily on the Supreme Court's *Overton Park* decision for the general proposition that an agency's post hoc rationalizations should play no part in a court's review of an agency's decision. However, *Overton Park* does not support the plaintiffs' argument other than by setting forth this general rule, for in *Overton Park* there was no administrative record to speak of and the district court decided the case based on affidavits proffered during the litigation. *See Overton Park,* 401 U.S. at 419–20, 91 S.Ct. 814. Conversely, here there is a voluminous administrative record upon which the Court has based its decision. Thus, although the Court agrees with the plaintiffs that *Overton Park* and its progeny [1] forbid the Court from taking into account post-hoc rationalizations, those cases do not

prevent the Court from relying upon the Reevaluation in this case to the extent that the document does not justify an action already taken, but instead explains the review process undertaken prior to the final decision issued by FHWA though the revised ROD.

The plaintiffs also point to the Ninth Circuit's decision in *Idaho Sporting Congress* in support of their position that the Reevaluation is a mere post hoc rationalization. Although *Idaho Sporting Congress* is distinguishable from the case at bar in most respects, it does apply to the defendants' use of the Reevaluation to discuss the impacts of the bypass on the South Fork Rivanna Reservoir. In *Idaho Sporting Congress,* although the Ninth Circuit recognized that the use of "non-NEPA" documents [2] "for the purpose of determining whether new information or changed circumstances require the preparation of a supplemental EA or EIS," *Idaho Sporting Congress,* 222 F.3d at 566, the Court held that the SIRs at issue in that case were improper for two reasons. First, the Ninth Circuit stated that, instead of being used solely to evaluate the significance of changes and new circumstances, the Forest Service used the SIRs in part to "present information and analysis that it was required, but ... failed to include in its original NEPA documents." *Id.* at 567. According to the Ninth Circuit, "[t]he Forest Service knew or should have known that it needed to provide this infor-

---

1. The plaintiffs cite numerous cases for the idea that an agency may not rely upon post hoc rationalizations to justify actions already taken. Again, while the Court agrees with general rule, the Court finds that those cases are of no further help to the plaintiffs' argument, except with regard to the Reevaluation's discussion of the impact of the bypass on the South Fork Rivanna Reservoir. As will be explained further below, that part of the Reevaluation goes beyond the proper

scope of a "non NEPA" document and attempts to justify decisions made earlier when the defendants issued their first ROD and subsequent FONSI.

2. *Idaho Sporting Congress* did not deal with a "reevaluation" document as here, but instead address the "supplemental information reports (SIRs)" used by the Forest Service to much the same effect. 222 F.3d at 564.

mation and analysis at the time it prepared the original EAs and EISs." *Id.* Second, the *Idaho Sporting Congress* Court noted that the SIRs were improper because they "were prepared in response to litigation, years after the original decisions to approve the timber sales were made." *Id.* at 568.

Except as to the Reevaluation's treatment of the Reservoir issue, neither of the circumstances leading to the Ninth Circuit's conclusion that the SIRs in the *Idaho Sporting Congress* case had been used in an improper, post hoc manner are present here. Other than with regard to the sections addressing the Reservoir, there is nothing in the administrative record to suggest that the Reevaluation was used to analyze issues that should have been included in the EIS but were not. Instead, the Reevaluation focuses on changes to the bypass design that arose after the filing of the EIS. Furthermore, as to the Reevaluation's treatment of the grade separated interchanges, there is nothing in the record to suggest that the defendants knew or should have known when the EIS was composed that CTB would later decide to terminate the interchange phase. Regardless, as discussed more fully below, the EIS evaluated alternatives not including the interchanges. However, as to the Reevaluation's treatment of the effects of the bypass on the South Fork Rivanna Reservoir and the mitigation measures to be employed in order to address those impacts, the Reevaluation does discuss matters that should have been dealt with more thoroughly in the FEIS and EA. Thus, like the SIRs in *Idaho Sporting Congress,* the Reevaluation's discussion of the Reservoir is a post hoc discussion of an issue about which final agency decisions had already been made in the form of a ROD and FONSI. However, the remaining sections of the Reevaluation cannot be faulted for analyzing information that should have been discussed in the original NEPA documents.

In addition, except as to the Reevaluation's Reservoir discussion, this case is unlike *Idaho Sporting Congress* because in that case the Forest Service, a federal agency, had issued a ROD on the logging in question prior to compiling the SIRs. *See id.* at 564, 568. Here, although the Reevaluation was expanded to address the interchange issue after the filing of this lawsuit, it was performed before, rather than after, a final federal decision had been made concerning the interchange issue. As a result, for all of the foregoing reasons, the Court will examine the Reevaluation and revised ROD, except for the portions thereof which discuss the effects of the bypass on the South Fork Rivanna Reservoir, for the Court is of the opinion that the remaining portions of documents are not post hoc rationalizations for final federal agency decisions previously made.

Other "post hoc justification" issues have arisen with the defendants' submission of two affidavits along with their papers filed on the cross motions for summary judgment. The first challenged affidavit is the declaration of Edward S. Sundra, a senior environmental specialist at the FHWA. The plaintiffs have moved to strike Mr. Sundra's affidavit because they argue that it is conclusory, outside the administrative record, and a post hoc rationalization. While clearly the Sundra affidavit is extra-record evidence, the Court has the discretion to admit it as a supplement to the record if it meets the criteria explained above. In essence, the Sundra affidavit provides a guide through the administrative record to illustrate the propriety of the defendants' actions. Arguably, the affidavit could be admitted as a supplement in order to provide background information helpful to an un-

derstanding of unclear or technical portions of the record. However, the Court will decline to use its discretion to admit the Sundra affidavit as a supplement because the defendants' briefs in this case are more than adequate to assist the Court in navigating the administrative record. Thus, the plaintiffs' motion to strike the declaration of Edward Sundra will be granted.

In addition, the plaintiffs have also moved to strike the affidavit of Mark Wittkofski, as well as its accompanying exhibits. The Wittkofski declaration and its exhibits were filed in response to the plaintiffs' contention in their summary judgment motion that the defendants did not conduct sufficient archaeological studies of the footprint of the northern terminus of the bypass after the design was changed from an at-grade interchange to a larger grade separated interchange. The Wittkofski declaration and accompanying documents address this argument by explaining that studies had been conducted by the defendants for the area covering the enlarged footprint. Mr. Wittkofski admits, however, that these studies were performed with regard to other projects and because of the defendants' error were not made part of the record here. The plaintiffs challenge the Wittkofski declaration as again being outside the record and a post hoc justification. Clearly the plaintiffs are correct that the Wittkofski affidavit is extra-record material. Furthermore, it appears to the Court that the declaration does not meet any of the abovementioned criteria for admission as a supplement to the record. However, as explained in more detail below, the Court will consider the Wittkofski declaration and its exhibits in order to determine whether it "shows that [the defendants have] rectified a NEPA violation after the onset of legal proceedings, [for] that evidence is relevant to the question of whether relief should be granted." *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 561 (9th Cir.2000). As a result, the Court will deny the plaintiffs' motion to strike the declaration of Mark Wittkofski and its attachments. Having settled these "post hoc justification" issues, the Court will now analyze the individual claims in the plaintiffs' complaint.

### A. Count One: Alleged Deficiencies in the Final EIS

NEPA requires, *inter alia,* that federal agencies prepare an EIS for all major federal actions "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The plaintiffs contend in Count One of the complaint that NEPA has been violated because the final EIS ("FEIS") for the 29 Corridor Project, which was approved in 1993 by the FHWA, is deficient in several respects. Specifically, the plaintiffs argue that the FEIS is inadequate because it (1) contains an insufficient discussion of alternatives, (2) fails to consider all of the direct environmental impacts of the Alternative 10 bypass, (3) fails to consider fully the indirect impacts of the bypass, and (4) fails to consider fully the cumulative impact of the bypass project. After a thorough review of the FEIS and the relevant portions of the administrative record, for the following reasons, the Court finds that the plaintiffs' contentions in Count One must fail.

#### 1. Alternatives

■ The NEPA regulations make clear that the discussion of alternatives is "the heart of the environmental impact statement." 40 C.F.R. § 1502.14. Thus, the regulations state that an EIS should:

(a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated

from detailed study, briefly discuss the reasons for their having been eliminated.

(b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewer may evaluate their comparative merits.

(c) Include reasonable alternatives not within the jurisdiction of the lead agency.

(d) Include the alternative of no action.

(e) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

(f) Include appropriate mitigation measures not already included in the proposed action or alternatives.

*Id.* The plaintiffs' major argument on the issue of the EIS's discussion of alternatives is that the EIS fails to consider a true "no build" alternative. This contention is completely without merit, however, for it was neither arbitrary nor capricious for the EIS to use the Base Case improvements as the "no build" alternative for the 29 Corridor project because that project had already been studied and approved and was slated to go forward regardless of the other alternatives selected. In light of the previous assessments regarding the Base Case and the decision to move forward with that project, there could not be a true no build alternative. As a result, the EIS's statement that, "[s]ince the Base

Case is a given, a strict No–Build condition was not contemplated," was sufficient to address the issue. Regardless, at this point, the plaintiffs' NEPA challenge on this ground is moot because the Base Case has been completed, thus making analysis of a true no-build scenario impossible.[3]

*2. Direct Impacts*

■ The NEPA regulations mandate that an EIS discuss the direct effects that a project will have on the environment. *See* 40 C.F.R. § 1502.16. The plaintiffs contend in Count One that the EIS fails adequately to discuss the direct impacts of the Alternative 10 bypass, including impacts on noise, traffic, land use, historic and recreational properties, the James spinymussel, and the South Fork Rivanna River Reservoir. Before explaining why the defendants have taken a hard look at the various direct impacts cited by the plaintiffs, the Court notes that the NEPA regulations expressly state that an EIS should be "analytic rather than encyclopedic" and that impacts "shall be discussed in proportion to their significance." *Id.* § 1502.2. According to the NEPA regulations, an EIS "shall be kept concise and shall be no longer than absolutely necessary to comply with NEPA." *Id.* Thus, the fact that the FEIS may not go into great detail on every impact does not mean that the defendants failed to take the requisite hard look at the issue.

■ Having conducted a thorough review of the FEIS and relevant portions of the administrative record, the Court finds

---

**3.** Although the plaintiffs do not address the argument in their summary judgment papers, Count One of the complaint also contends that the discussion of alternatives in the EIS was flawed because the EIS made the same land use and socioeconomic assumptions regardless of the alternative considered. While the Court will not delve into this argument too deeply given the plaintiffs' failure to support it, the Court notes that the argument is without merit, for it is well settled that the agency has the discretion to determine proper testing methods. *See Valley Citizens*, 886 F.2d at 469. Therefore, although the method of comparison used in the EIS might not have been ideal, it was not arbitrary and capricious for the FHWA to rely upon it.

that the defendants took the requisite hard look and have considered all relevant factors with regard to the direct effects of the project alternatives on the surrounding environment. Indeed, of the forty pages in the FEIS dedicated to analysis of environmental consequences, a significant portion specifically addresses the direct impacts to which the plaintiffs now point. As to noise impacts, it is clear from a reading of the FEIS that the defendants took a hard look at the problem. According to the plaintiffs, however, the noise impact analysis in the FEIS failed to consider all of the relevant factors. To the contrary, the FEIS and the noise analysis on which it was based examined the noise impacts according to the criteria established by the FHWA regulations and discussed noise abatement measures for areas that would suffer impacts. *See* FEIS at IV–22 to IV–28; *see also* Noise Analysis of 1990 (separately bound administrative record document).

■ Furthermore, the plaintiffs' contention the FEIS did not address the increase in noise levels that would result from trucks is contradicted by the Noise Analysis, which states that traffic data input into the study model "included volumes and speeds of automobiles, medium trucks, and heavy trucks." Noise Analysis of 1990 at 20. Thus, the FEIS satisfied NEPA with regard to its discussion of noise impacts as those impacts related to the project design as of the time the FEIS was issued.[4] Similarly, the Court is of the opinion that the FEIS is also adequate under NEPA in its treatment of the project's impacts on traffic, land use, Agricultural and Forestal district land,[5] and historic and recreational properties. *See* FEIS at IV 1–4, 9–10, 16–19, 35.

■ The Court also finds that the FEIS adequately addresses the project's effects on the James spinymussel (*Pleurobema collina*). The studies conducted prior to the FEIS indicated that the populations of the James spinymussel, a recognized endangered species, were upstream from the proposed bypass alignments. Therefore, the relatively cursory treatment given the James spinymussel in the FEIS was neither arbitrary nor capricious because only brief discussion is necessary when a matter is determined to be insignificant, as was the James spinymussel issue at the time the FEIS was published. *See* 40 C.F.R. § 1502.2.[6] Lastly, although

4. Furthermore, the Court finds that the defendants took a hard look at the noise impacts brought about by later changes to the project, specifically the 1997 Final Design Noise Report, in the Reevaluation, *see* Reevaluation at 35–36. Defendant's decision that the impacts were not significant was not arbitrary and capricious.

5. The FEIS determined that no Agricultural and Forestal District land would be taken by Alternative 10. Thus, the short treatment given the issue in the FEIS was appropriate. See 40 C.F.R. § 1502.15 (noting that "analyses in a statement shall be commensurate with the importance of the impact, with less important material summarized, consolidated, or simply referenced."). Later changes in the design of Alternative 10, however, did cause a small encroachment of less than an acre into the Ivy Creek Agricultural and Forestal District. Because less than one acre was involved in the taking, no public hearing was required under Virginia law. *See* Va. Code Ann. § 15.2–4313. The Agricultural and Forestal District involvement that arose as a result of the design changes was given a hard look by the defendants in the Reevaluation, *see* Reevaluation at 40–41, and the Court is of the opinion that the defendants' finding that the encroachment was not a significant impact was neither arbitrary nor capricious.

6. The fact that the FEIS's conclusions about the location of the spinymussel were eventually proven incorrect does not mean that the FEIS violated NEPA under Count One. Rather, the defendants' actions after the further information about the spinymussel came to

the Court finds that the FEIS failed to take a hard look at the effects of the project on the South Fork Rivanna Reservoir and at mitigation measures to address the problem, the Court is of the opinion the such flaws are more properly addressed in Count Two.

### 3. Indirect Impacts

■ The plaintiffs contend that the FEIS is inadequate under NEPA because it fails adequately to address the indirect impacts, specifically the growth inducing impacts, of the bypass. See 40 C.F.R. §§ 1502.16(b) (noting that the EIS should discuss indirect impacts and their significance), 1508.8(b) (defining indirect impacts as those which are "later in time or farther removed in distance, but are still reasonably foreseeable" and noting that indirect impacts "may include growth inducing effects. . . ."). After a thorough review of the FEIS and relevant background studies in the administrative record, the Court finds that the defendants took a hard look at the issue and that the decision to include only limited discussion of the issue in the FEIS was not arbitrary or capricious. In 1990, the defendants produced a Socio–Economic and Land Use Analysis of the various alternatives being considered for the Route 29 Corridor. In that study, the defendants looked at many factors, including future land use in the area and the effects that the alternatives would have on that land use. See 1990 Land Use Analysis at 15–20, 50–54 (separately bound administrative record document). As to the effects of the Alternative 10 bypass on land use, the study stated that the bypass, "near its intersection with Route 29 North, passes through an area designated for medium-density residential and commercial uses on the County's Land Use Plan." Id. at 52. Furthermore, as to

future land use in the area of the project, the study states that, "[i]n the County [of Albemarle], the major areas of expected development . . . include both commercial and residential uses in the Pantops area, low-density residential east of the Southern Railroad tracks and south of the South Fork Rivanna River, low and medium density residential north of the South Fork and east of Route 29 north, and a large industrial area between the Charlottesville Albemarle Airport and Route 29." Id. at 19. In addition, the FEIS indicates "because of community concerns over induced development, interchanges [originally part of the design of the Alternative 10 bypass] at Barracks Road (Route 654) and Route 743 have been eliminated so that no access will be provided between the two terminus points." FEIS at IV–10. The FEIS notes that future interchanges on the bypass would require the request of Albemarle County. See id.

Based upon the land use studies and information discussed above, the FEIS draws the following conclusion about the growth-induced impact of the project:

Some residents have expressed the concern the bypass alternatives would cause development in rural areas. It is true that alternatives in these areas could encourage additional residential development, but this development could be restricted to densities permitted under existing zoning and land use regulations. Highway facilities are only one of the factors influencing development patterns. If the County restricts utilities and enforces land use regulations in these areas, it should be able to prevent unwanted commercial development and to limit the amount and density of residential development.

light must be assessed later with regard to

other counts in the plaintiffs' complaint.

*Id.* Given fact that the 1990 Land Use Analysis showed that the termini of the Alternative 10 bypass were to be located in areas already determined to be major growth areas and the fact that the intermediate interchanges which could have induced growth into rural areas were eliminated from the project, the Court finds that the relatively limited treatment of growth induced impacts in the FEIS was not arbitrary or capricious. Furthermore, the Court notes that this case differs from *City of Davis v. Coleman,* 521 F.2d 661 (9th Cir.1975), and *Mullin v. Skinner,* 756 F.Supp. 904 (E.D.N.C.1990), for in those cases the highway projects were designed to promote access to areas where development had previously been limited. To the contrary, the termini of the Alternative 10 bypass are located in already developed areas, and the absence of any interchanges between the two termini will likely not contribute to growth in less developed areas. Thus, the Court is of the opinion that the FEIS is not inadequate under NEPA.

### 4. Cumulative Impacts

Although Count One of the complaint alleges that the FEIS was deficient under NEPA because it failed to consider the effects of the bypass in conjunction with other past, present, and reasonably foreseeable future actions, the parties have not addressed this issue with regard to this Count. Thus, it appears to the Court that the cumulative impacts analysis undertaken by the defendants should be taken up with regard to Count Nine. As a result, because the Court finds that the defendants took a hard look at the issues addressed in Count One and did not act in an arbitrary and capricious manner in compiling the FEIS, the Court will grant the defendants' motion for summary judgment as to Count One and will deny the plaintiff's motion.

### B. Count Two: Alleged Deficiencies in the Final EA

In Count Two, the plaintiffs allege that the FHWA violated NEPA by arbitrarily and capriciously approving an Environmental Assessment ("EA") and issuing a finding of no significant impact ("FONSI") with regard to the modification of the termini of the Alternative 10 bypass. According to the plaintiffs, the termini modifications required a new or supplemental EIS. Again, under NEPA, an EIS is required for a major federal action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). To determine the necessity of preparing an EIS, an agency may prepare an EA. *See* 40 C.F.R. §§ 1501.3, 1508.9. If the EA process leads the agency to the conclusion that no significant impact will arise from the proposed action, then the agency issues a FONSI. *See id.* § 1508.13. The plaintiffs contend that, because the modification of the bypass termini will have a significant impact on the environment, it was arbitrary and capricious for FHWA to issue a FONSI instead of conducting a supplemental EIS.

First, the plaintiffs contend that the modifications in the termini of the Alternative 10 bypass will bring the road closer to the South Fork Rivanna Reservoir and cause the road to run on steeper slopes, thereby producing significant environmental impact by posing a great risk of harm to the Reservoir and to public health. The plaintiffs next contend that the bypass, as modified, would adversely affect protected Agricultural and Forestal District land. The plaintiffs also assert that only a small portion of the footprint of the road in the area of the modified northern terminus has been surveyed, thus creating a significant impact by way of imposing a risk of loss of archaeological and cultural resources. In addition, the plaintiffs point to the fact that there has been a high degree of con-

troversy surrounding the bypass since the beginning, which constitutes a significant adverse impact. Finally, the plaintiffs posit that a supplemental EIS was needed because the design of the termini has been changed since the final EA to include complex interchanges.

■ After reviewing the administrative record, the Court is of the opinion that the defendants failed, in both the FEIS and the EA, to give a hard look to the impact of the bypass. As a result, the defendants' decision to issue a FONSI rather than begin a supplemental EIS was not in accordance with law and must be overturned. The Court's examination of the record reveals that neither the FEIS nor the EA sufficiently addressed the impacts on the Reservoir. Although the Reservoir is included in the section of the FEIS discussing environmental consequences, the defendants review the impacts of the bypass on the Reservoir in a conclusory and abbreviated manner, particularly with regard to contamination by pollutants and hazardous materials. *See Coalition for Canyon Preservation v. Bowers,* 632 F.2d 774, 782 n. 3 (9th Cir.1980) (noting that a particular discussion in an EIS was insufficient under NEPA because it was conclusory and abbreviated). As to pollutants, the EIS simply states that "[c]ontamination of the reservoir from automotive-related pollutants is not expected to be a problem. Numerous roads already cross the reservoir watershed without compromising the reservoir's use as a water supply." · FEIS at IV–34. No further analysis is set forth, nor any discussion about the ways in which a bypass highway like Alternative 10 could have different impacts than the other roads currently in the watershed.

As to hazardous wastes, the FEIS's analysis is similarly truncated. *See id.* at IV–37. Furthermore, the FEIS fails to provide adequate discussion of mitigation measures. *See Neighbors of Cuddy Mountain v. United States Forest Service,* 137 F.3d 1372, 1380 (9th Cir.1998) (noting that the defendant's "perfunctory description of mitigating measures is inconsistent with the 'hard look' it is required to render under NEPA."). For example, as to the hazardous waste issue, the FEIS simply states that "[l]ocal response teams would be responsible for containing spills to prevent their reaching the reservoir." FEIS at IV–37.

■ Discussion of the Reservoir in the EA is similarly inadequate. Although an EA is meant to be a "concise public document," 40 C.F.R. § 1508.9, the EA's exceedingly brief discussion of the Reservoir makes no mention of the consequences of the fact that the realignment of the northern terminus places the bypass on a steeper slope and closer to the Reservoir. Furthermore, although the EA does mention that a stormwater management plan will be prepared, the EA provides insufficient detail to ensure that the environmental consequences of the terminus shift on the Reservoir have been fairly evaluated. *See Cuddy Mountain,* 137 F.3d at 1380. Although the Reevaluation discusses the bypass project's effects on the Reservoir and the mitigation efforts in place to address those impacts more fully than do the FEIS and EA, *see* Reevaluation at 24–25, 36–38, the defendants' use of the Reevaluation to address issues that should have been included its original NEPA documents is an improper post hoc justification, which the Court may not take into account. *See Idaho Sporting Congress,* 222 F.3d at 566–67. As a result, the defendants must complete a supplemental environmental impact statement which will satisfactorily address the impacts of the bypass on the Reservoir and the mitigation measures that will be used to combat those impacts.

■ In addition, although the EA demonstrates that the defendants performed

the necessary studies to enable them to take a hard look at the cultural and archaeological resources that might be affected by the modification of the northern terminus, as that terminus was envisioned at the time of the EA, *see* A.R. at 5689, the defendants have not addressed in any environmental document the archaeological effects of the decision to modify the interchange at the northern terminus from an at-grade interchange to a grade separated interchange which leaves a larger "footprint." The defendants admitted in their papers and at oral argument that there is currently no documentation in the administrative record to show that archaeological studies in the enlarged footprint were performed. To rectify the situation, the defendants have proffered the affidavit of Mark Wittkofski for the proposition that, although the studies were omitted from the administrative record, studies covering the enlarged footprint have been performed by the defendants with regard to other projects and have revealed no significant sites other than those discussed in the administrative record. However, neither Mr. Wittkofski's affidavit nor any other evidence in the record shows that the defendants' considered this archaeological data with regard to this project. As a result, the Court cannot, based on the current record, conclude that the defendants have taken a hard look at archaeological impacts in the footprint of the northern terminus. Therefore, the defendants' supplemental EIS should also include a discussion of that issue. The Court notes that Mr. Wittkofski's affidavit

and accompanying exhibits appear to demonstrate that the requisite studies may already have been performed. To the extent that the studies have already been performed, no new studies would be needed in conjunction with preparing the SEIS. *See Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017, 1026 (9th Cir.1980) (noting that remand in that case was unnecessary because the "district court could not order the Corps [of Engineers] to conduct studies already completed to answer questions the Corps has already answered on a basis that could not be successfully challenged"). However, because it is not entirely clear to the Court that the studies mentioned in Mr. Wittkofski's affidavit actually correspond to the footprint of the revised interchange, the defendants should discuss the issue in the SEIS. Thus, because a hard look was not taken with regard to the issues addressed above, FHWA's decision not to supplement the EIS was arbitrary and capricious and not in accordance with law. As a result, the Court will grant the plaintiffs' motion for summary judgment on Count Two and will enjoin further action by the defendants on the bypass project until a supplemental EIS addressing the Reservoir and archaeological issue discussed above has been completed.[7]

### C. Count Three: Alleged Failure to Supplement EIS after Substantial Changes in Project

Count Three sets forth the plaintiffs' objections that are at the heart of this

---

**7.** However, the SEIS need not address the other issues raised in Count Two. As to the controversy surrounding the project, the Court simply notes that controversy is simply one factor in evaluating the significance of an impact, *see* 40 C.F.R. § 1508.27, and the fact that this project is controversial does not mean, in and of itself, that the FHWA acted arbitrarily or capriciously in issuing the FONSI. 40 C.F.R. § 1508.27. In addition, as ex-

plained above, Agricultural and Forestal Districts were properly and adequately addressed in the Reevaluation. Lastly, with the exception of the archaeological findings, the Court is of the opinion that the Reevaluation evidences a hard look by the defendants with regard to the post-EA changes in design of the termini and that FHWA did not make a clear error in judgment by not performing a SEIS.

controversy. It is the plaintiffs' contention that the decision to "scrap" the sequencing of alternatives chosen in the FEIS by eliminating the grade separated interchanges and proceeding directly to the bypass represents a substantial change in the proposed action that requires an SEIS. *See* 40 C.F.R. § 1502.9(c). The FHWA regulations direct that the agency shall supplement an EIS whenever it determines either that changes in the proposed action would result in significant impacts not evaluated in the EIS or that new information or circumstances would result in environmental impacts not evaluated in the EIS. *See* 23 C.F.R. § 771.130. In addition, NEPA regulations require an EA or other "appropriate environmental studies" if the significance of a change or new information is "uncertain." *Id.* § 771.130(c). As discussed above, in order to make the initial determination about whether a change or new information meets the threshold of "significance" or "uncertainty" needed to require further environmental documentation, an agency may use "non-NEPA" documents such as the Reevaluation employed by the defendants. *See id.; see also Price Road,* 113 F.3d at 1510.

■ The crux of the plaintiffs' argument in Count Three is that the project without the grade separated interchanges is completely different from the combination of alternatives selected in the FEIS. According to the plaintiffs, a supplemental EIS must be done because the impacts of going forward with the bypass alone have not been evaluated and because the bypass-only option will actually make traffic worse on the Route 29 corridor. The Court will take up the second aspect of the plaintiffs' argument first. While it might be true that the defendants' decision to eliminate the interchanges will turn out to be unwise, it is not the role of this Court to substitute its judgment for that of the agency. *See Adler,* 675 F.2d at 1096 (stating that "a court in its review may not substitute its judgment, but instead is limited to ensuring that the agency has considered the environmental consequences of its action"). Rather, the Court must determine whether or not the agency took a hard look at the environmental consequences of the change and, if so, whether the decision not to supplement the EIS was arbitrary and capricious. After conducting a through review of the relevant portions of the administrative record, the Court is of the opinion that the defendants' took a hard look at the issues raised in Count Three and that the decision not to supplement the EIS was a reasonable one.

As noted above, an SEIS is only required for significant changes that were not previously evaluated in the EIS. *See* 23 C.F.R. § 771.130. Here, the FEIS evaluated the various bypass options, including Alternative 10, independently of the interchanges. Thus, because the impacts of proceeding with only the Alternative 10 bypass and the Base Case had already been given a hard look in the EIS, the FHWA did not need to supplement the FEIS. In addition, the Reevaluation assessed the elimination and concluded that the change did not present any significant environmental impacts not already considered in the EIS. *See* Reevaluation at 18–20. As a result, this case is unlike *Dubois v. United States Department of Agriculture,* 102 F.3d 1273, 1291–92 (1st Cir.1996), in which the First Circuit held that an SEIS was needed where an alternative was selected in the FEIS that was within the "spectrum of alternatives" that were considered in previous drafts of the EIS. Clearly, going forward with a bypass and the Base Case was among the alternatives considered in the FEIS; thus, *Dubois* is inapposite to the case at bar.

In addition, the Court cannot say that the defendants' decision to go forward with the bypass without an SEIS was arbitrary and capricious because, as the plaintiffs contend, the elimination of the interchanges thwarts the purposes and needs of the project. According to the FEIS, the Route 29 corridor improvements are "needed to solve existing and future traffic congestion problems and to complete the Charlottesville area element of ongoing improvements to Route 29 throughout central Virginia." FEIS at S–1. Although the completion of the gap in ongoing improvements to Route 29 is labeled a "secondary" purpose of the project and although the administrative record shows that the traffic along the congested section of Route 29 between Route 250 and the South Fork of the Rivanna River is primarily local, the fact remains that the administrative record shows through traffic to be a factor in the congestion and a focus of the project. See, e.g., FEIS at III–1. Likewise, nothing in the record shows that the bypass was somehow contingent upon the other phases of the project, for all of the phases adopted by the CTB include provisions for the bypass. Therefore, the Court finds that defendants were not arbitrary and capricious in deciding that the elimination of the interchanges did not present a "seriously different picture of the environmental impact of the proposed project from what was previously envisioned." Hickory, 893 F.2d at 63 (quoting Froekhlke, 816 F.2d at 210).

As to new circumstances that could significantly affect the environment, the Court is of the opinion that the defendants also gave these factors a hard look and did not act in an arbitrary and capricious manner in deciding that the new circumstances did not require an SEIS. Specifically, with regard to the James spinymussel, although the defendants' conclusions in the EIS and EA were incorrect as to the location of the endangered species in the project area, the defendants took a hard look at the issue when the new information came to light. See Reevaluation at 39–40. When two investigations yielded differing opinions on whether the bypass would impact the spinymussel, FHWA requested input from the USFWS, and USFWS informed FHWA that a formal consultation and Biological Assessment would be required. See id. at 40. FHWA conducted its Biological Assessment and determined that there would be no significant adverse impact on the spinymussel because of the project. See id; see also A.R. at 8519–8525. After completing its consultation, USFWS issued a Biological Opinion which concluded that, as long as the project adhered to certain conditions, it was "not likely to destroy or adversely modify designated critical habitat, since no critical habitat exists for this species." A.R. at 8675. Thus, on the issue of the James spinymussel, it is clear that FHWA took a hard look and, even though the plaintiffs disagree with the conclusion, its decision was not arbitrary and capricious.[8] As a result, for all of the foregoing reasons, the Court finds that the defendants took a hard look at the issues set forth in Count Three and that the decision to go forward with the project without completing a supplemental EIS was not arbitrary and capricious. Accordingly, the Court will

---

8. The plaintiffs' other contentions on the "new circumstances" issue are similarly without merit. Regarding the Meadowcreek Parkway, it is not arbitrary and capricious for the defendants to assume that the parkway will be built, for it is still a part of the CATS plan.

See Reevaluation at 19. Furthermore, the fact that the location and design of the northern terminus of the bypass have been changed since the FEIS in order to account for development in the area shows that the defendants took a hard look at that issue as well.

grant the defendants' motion for summary judgment as to Count Three.

### D. Count Four: Alleged Failure to Analyze and Approve the Decision to Proceed with the Alternative 10 Bypass without the Interchanges

Count Four can be dealt with in summary fashion, for it does not appear that the count offers any new allegations of NEPA violations by the defendants other than the failure to approve the change in the project's phasing in a new ROD. As to defendant's alleged failure to produce a supplemental EIS to analyze the impact of the elimination of the interchanges, the Court has already explained that the defendants took a hard look at the change and concluded, in a manner that was not arbitrary and capricious, that a supplemental EIS was not needed. With regard to the failure to approve the change with a ROD, that contention is now moot, for FHWA has now issued a revised ROD approving the decision to go forward with the western bypass in the absence of the grade separated interchanges. *See* Amended A.R. at 867–A.; *see also* 23 C.F.R. § 771.127(b) (stating that a revised ROD is necessary when FHWA "subsequently wishes to approve an alternative which was not identified as the preferred alternative but was fully evaluated in the final EIS, or proposes to make substantial changes to the mitigation measures or findings discussed in the ROD"). As a result, the Court will grant the defendants' motion for summary judgment on Count Four of the plaintiffs' complaint.

### E. Count Five: Alleged Section 4(f) Violations with Regard to Schlesinger Farm and Westover

As stated above, Section 4(f) forbids the Secretary of Transportation from approving a highway project that requires the "use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national, State, or local significance," unless "(1) there is no prudent and feasible alternative to using that land; and (2) the program or project includes all possible planning to minimize harm to the park, recreational area, wildlife and waterfowl refuge, or historic site resulting from the use." 49 U.S.C. § 303. A "use" occurs for Section 4(f) purposes when protected land "is permanently incorporated into a transportation facility" (direct use), or when "the project's proximity impacts are so severe that the protected activities, features, or attributes that qualify a resource for protection ... are substantially impaired" (constructive use). 23 C.F.R. § 771.135(p). According to the regulations, "[s]ubstantial impairment occurs only when the protected activities, features, or attributes of the resource are substantially diminished." *Id.* In Count Five, the plaintiffs contend that Section 4(f) has been violated because the Alternative 10 bypass will constructively use Schlesinger Farm and will directly and constructively use Westover, both of which are protected by Section 4(f). After a thorough review of the relevant portions of the administrative record, the Court is of the opinion that a hard look was taken at the issues presented in Count Five and that (1) the Secretary acted within the scope of his authority when deciding that the bypass did not use Schlesinger Farm and Westover, (2) the Secretary's actions were not arbitrary and capricious, and (3) the Secretary followed proper procedures.

### 1. Schlesinger Farm

According to Count Five, Schlesinger Farm will be improperly used in violation of Section 4(f) because the right of way for the bypass will pass within 55 feet of the

property line and because the bypass will result in visual, noise, and aesthetic impacts on the farm which will disturb the tranquil rural setting that is a contributing factor to the farm as an historic resource. After reviewing the Final Section 4(f)/106 Evaluation and other relevant portions of the administrative record, it is clear that the Secretary acted within the scope of his authority, came to a decision which was neither arbitrary nor capricious, and followed proper procedure. The Final Section 4(f)/106 Evaluation shows that Secretary took a hard look at the impact of the bypass project on Schlesinger Farm. Although defendants' studies of potential historic properties resulted in a finding for purposes of Section 106 of the Historic Preservation Act that the Alternative 10 bypass would have an adverse effect because the "highway would be visible from the property" and the "view of the highway would disturb the tranquil rural setting that is a contributing factor of this historic resource," see FEIS at B–5, "a finding of adverse effect under [Section] 106 does not necessarily equate to an finding of constructive use under Section 4(f)." *City of South Pasadena v. Slater,* 56 F.Supp.2d 1106, 1122 n. 17 (C.D.Cal.1999); *see also Nashvillians Against I–440 v. Lewis,* 524 F.Supp. 962, 977 n. 37 (M.D.Tenn.1981).

With regard to Schlesinger Farm's historical significance, the defendants determined that the property was

eligible for the National Register of Historic Places because it "appears to be a relatively rare, intact example of a Depression-era farm." FEIS at VIII–11; *see also* Phase II Historic Architectural Investigations at 28–29 (separately bound administrative record document). Thus, although the "visual and audible elements" adversely effect the property by disturbing the property's rural setting to some degree, the defendants were not arbitrary and capricious in finding that there was no constructive use of the property because the visual and audible impacts did not substantially diminish the protected attributes of the farm. See 23 C.F.R. § 771.135(p). Even though the bypass may disturb the view from the property somewhat, the Secretary did not violate Section 4(f) by determining that the visual impact produced by the road would not substantially diminish the property's value as an intact model of a Depression-era farm. Thus, the Court will not disturb the Secretary's decision.[9]

### 2. Westover

With regard to the Westover property, it is even more clear that the Secretary acted within the scope of his authority, did not abuse his discretion, and followed proper procedures.[10] The studies conducted on the Westover property concluded that the "building is a typical example of an early twentieth-century upper-class house, but due to its architectural

---

**9.** Because the Court finds that the Secretary did not act in an arbitrary and capricious manner in determining that the Alternative 10 bypass would not use Schlesinger Farm, there is no need to analyze the consideration of prudent and feasible alternatives. Furthermore, it goes without saying that the Secretary followed proper procedures under Section 4(f) as to Schlesinger Farm, for studies were undertaken and the results analyzed in a Section 4(f) evaluation.

**10.** Although the complaint indicates that Westover is subject to both direct and constructive uses, at summary judgment, the plaintiffs did not press the argument that a direct use would take place. The omission of discussion of direct use seems proper to the Court because its review of the record has revealed no direct use of the Westover property by the Alternative 10 bypass. *See, e.g.,* Reevaluation at 30.

integrity, both exterior and interior, and setting, JMA recommends the property eligible for the National Register ... as a representative of the twentieth-century rural development context." Phase II Historic Architectural Investigations at 34. Although the Final Section 4(f)/106 Evaluation noted that the Alternative 10 bypass would have a visual effect on the property, *see* FEIS at VIII–1, the defendants determined that the bypass would not even have an adverse effect on Westover for Section 106 purposes because "the house and its surrounding five-acre landscaped parcel are the principal features contributing to the property's historic significance" and the project's right of way is "800 feet from the house and 600 feet from the five acre parcel." *Id.* at B–5. Based on its review of the relevant portions of the administrative record, the Court is of the opinion that the Secretary's decision that the Alternative 10 bypass will not use the Westover property was the result of a hard look taken by the defendants and was not arbitrary or capricious. Surely, if the primary historic significance of Westover lies in its architecture and the landscaping surrounding the house, then it was reasonable for the Secretary to conclude that the visual impact of the bypass would not significantly diminish the property's protected attributes. 23 C.F.R. § 771.135(p).[11] As a result, for the reasons explained above, the Court will grant the defendant's motion for summary judgment as to Count Five of the plaintiffs' complaint.

### F. Counts Six and Seven: Alleged Section 4(f) Violations with Regard to the Albemarle School Complex

In Count Six of the complaint, the plaintiffs contend that Section 4(f) has been violated because the Alternative 10 bypass will use, directly and constructively, playgrounds and running trails on the Albemarle County School Complex. After the plaintiffs' lawsuit notified the defendants of the use of the running trails and after discovering that the entire school property, rather than just the recreation areas, constituted Section 4(f) resources, the defendants conducted a new Section 4(f) evaluation of the entire Albemarle County School Complex, as well as Agnor–Hurt School. Subsequently, the plaintiffs amended their complaint to add Count Seven, which again alleged Section 4(f) violations with regard to the school property. Thus, because the two counts are intertwined, the Court will address them as one.

### 1. The Albemarle County School Complex

There is no debate that the Alternative 10 bypass will directly use the Albemarle County School Complex, for it will require the "acquisition of approximately 15.17 acres of wooded land from the northern edge of the property." Final Section 4(f) Evaluation: Albemarle County School Properties ("Section 4(f) Evaluation") at 26.[12] Thus, the question becomes whether

---

11. As with Schlesinger Farm, because the Court finds that the Secretary did not act in an arbitrary and capricious manner in determining that the Alternative 10 bypass would not use Westover, there is no need to analyze the consideration of prudent and feasible alternatives. Furthermore, it again goes without saying that the Secretary followed proper procedures under Section 4(f) as to Westover, for studies were undertaken and the results analyzed in a Section 4(f) evaluation.

12. Since it is undisputed that there is a direct use of the Albemarle County School Complex, the Court need not address any potential constructive uses; instead, the Court will proceed directly to the analysis of whether there were other prudent and feasible alternative and whether the defendants engaged in all possible planning to minimize harm to the protected resource.

"(1) there is no prudent and feasible alternative to using that land; and (2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use." 49 U.S.C. § 303. After assessing numerous alternatives, the defendants concluded that there was no prudent and feasible alternative for using the land at the Complex.

■ After a thorough review of the relevant portions of the administrative record, the Court is of the opinion that the Secretary acted within the scope of his authority, came to a conclusion that was not arbitrary or capricious, and followed all proper procedures. First, the defendants assessed a wide range of potential alternatives to using the Complex property, including the previous alternatives from the FEIS, other location alternatives to the east and west of the current alignment, and modifications to Alternative 10. *See* Section 4(f) Evaluation at 35–61. Because the defendants' efforts to explore alternatives evidences a hard look at the issues, the Court concludes that the Secretary "could have reasonably believed that in this case there are no feasible alternatives or that alternatives do involve unique problems." *Overton Park,* 401 U.S. at 416, 91 S.Ct. 814; *see also Committee to Preserve Boomer Lake Park v. Department of Transp.,* 4 F.3d 1543, 1551 (10th Cir.1993) (noting that "the Secretary's obligation under § 4(f) is to examine enough alternatives 'to permit sound judgment that the study of additional [alternative routes] is not worthwhile' ") (quoting *Eagle Foundation, Inc. v. Dole,* 813 F.2d 798, 807 (7th Cir.1987)). Furthermore, based on its examination of the record, the Court cannot say that the Secretary's choice was arbitrary and capricious, or that proper procedures were not followed. Similarly, with regard to measures to minimize harm, the Court also finds that the defendants took a hard look at such measures, *see* Section 4(f) Evaluation at 61–65, and that the measures chosen were neither arbitrary nor capricious. The Court's conclusion as to the defendants' planning to minimize harm to the Complex is not diminished by the fact that the defendants chose not to contact the County of Albemarle after submission of the draft Section 4(f) Evaluation as suggested by the Department of the Interior, for the defendants were not required to defer to another agency on the issue. *See Roanoke River Basin Ass'n v. Hudson,* 940 F.2d 58, 64 (4th Cir.1991). Thus, the Court will not disturb the defendants' conclusion that there were no feasible and prudent alternatives to using the Complex property, nor will the Court set aside the defendants' choices of mitigation measures.

### 2. *Agnor–Hurt School*

■ Because the bypass will not take any portion of the Agnor–Hurt property, the first issue is whether the bypass will constructively use the school grounds. According to the plaintiffs, the bypass would constructively use Agnor–Hurt by creating noise and aesthetic impacts. *See* 23 C.F.R. § 771.135(p)(4) (stating that constructive use can occur when the "projected noise level increase attributable to the project substantially interferes with the use and enjoyment of a noise-sensitive facility" or when the "proximity of the proposed project substantially impairs esthetic features or attributes of a resource protected by section 4(f)"). After a thorough review of the record, the Court is of the opinion that the defendants took a hard look at the impacts of the bypass on Agnor–Hurt and concluded in a manner that was neither arbitrary nor capricious that no constructive use would occur. According to the Section 4(f) Evaluation, Alternative 10 "will not substantially im-

pair activities, features, or attributes that qualify the Agnor–Hurt Elementary School property for protection under Section 4(f)." Section 4(f) Evaluation at 35. Because the defendants concluded that the recreational facilities affected by the noise and visual impacts of the bypass were not noise-sensitive and that differences in elevation and the existing wood buffer would screen the bypass from view, *see id.* at 35, the Secretary was within the scope of his authority and did not arbitrarily and capriciously conclude that no constructive use would occur.[13] Thus, because the Court finds that the defendants took a hard look at the issues raised in Counts Six and Seven [14] and that their decisions with regard to those issues followed proper procedure, was within the scope of authority, and was not arbitrary and capricious, the Court will grant the defendants' motion for summary judgment as to those counts. *See Boomer Lake Park,* 4 F.3d at 1551.

### G. *Count Eight: Reevaluation as a "Post Hoc Rationalization"*

Count Eight alleges that NEPA has been violated by FHWA's decision to issue the Reevaluation instead of a new or supplemental EIS. Because the Court has already explained at length above why the Reevaluation is not a post hoc justification for a decision already made by FHWA, except with regard to its discussion of the impacts of the bypass on the South Fork

Rivanna Reservoir, the Court finds that the plaintiffs' argument in Count Eight is without merit other than as it relates to the issue of the Reservoir. Furthermore, as to the Reservoir issue, the plaintiffs' argument is moot because summary judgment has already been granted in Count Two on that ground. As a result, for the reasons stated earlier in this discussion, the Court will grant the defendants' motion for summary judgment as to Count Eight.

### H. *Count Nine: Alleged Failure of the Final EIS to Address Cumulative Impacts and Connected Actions*

NEPA requires that an EIS discuss all "connected" and "cumulative" actions. 40 C.F.R. § 1508.25. Count IX of the plaintiffs' amended complaint alleges that the FEIS submitted by the defendants for the Route 29 Corridor project violates NEPA because it does not address other past, present, and future projects that are "connected" or "cumulative" in relation to the bypass. According to the NEPA regulations, a cumulative impact is one "which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . undertakes such other actions." *Id.* § 1508.7. The regulations also state that cumulative impacts "can result from individually minor but collectively significant actions taking

---

**13.** Because the Court finds that the Secretary did not act in an arbitrary and capricious manner in determining that the Alternative 10 bypass would not use Agnor–Hurt, there is no need to analyze the consideration of prudent and feasible alternatives. Furthermore, it again goes without saying that the Secretary followed proper procedures under Section 4(f) as to Agnor–Hurt, for studies were undertaken and the results analyzed in a Section 4(f) evaluation.

**14.** Although plaintiffs failed in their complaint to address their archaeological concerns within the context of Section 4(f), they nevertheless argue in their summary judgment motion that the defendants have violated the statute in this respect. However, since the Court is already enjoining further action by defendants until an SEIS addressing the Reservior and the archaeological issue is completed, we need not address the question of whether Section 4(f) applies to archaeological studies.

place over a period of time." *Id.* The regulations define connected actions as those which are "closely related and therefore should be discussed in the same impact statement." *Id.* § 1508.25(a)(1). Actions are deemed connected if they (1) automatically trigger other actions which may require EISs, (2) cannot proceed unless other actions are taken previously or at the same time, and (3) "[a]re interdependent parts of a larger action and depend on the larger action for their justification." *Id.* By requiring that a single EIS address cumulative and connected actions, the regulations seek to prevent agencies from "segmenting" projects to avoid NEPA. *See National Wildlife Fed'n v. Federal Energy Regulatory Comm'n,* 912 F.2d 1471, 1476 (D.C.Cir.1990) ("The statutory and regulatory scheme requires comprehensive analysis of the impact of connected or cumulative proposed actions in order to 'prevent agencies from dividing one project into multiple individual actions "each of which individually has an insignificant environmental impact, but which collectively have a substantial impact." ' " (quoting *Natural Resources Defense Council, Inc. v. Hodel,* 865 F.2d 288, 297–98 (D.C.Cir.1988) (quoting *Thomas v. Peterson,* 753 F.2d 754, 758 (9th Cir.1985)))); *see also* 23 C.F.R. § 771.111(f) (stating that in order for an action evaluated in an EIS to avoid being an improper segment it must (1) "connect logical termini and be of sufficient length to address environmental matters on a broad scope," (2) possess "independent utility or independent significance," and (3) "not restrict consideration of alternatives for other reasonably foreseeable transportation improvements").

The plaintiffs argue that the defendants violated NEPA by failing to consider the following cumulative or connected projects: (1) the proposed widening of Route 29 North from the South Fork of the Rivanna River to Airport Road, (2) proposed front-

age or service roads that would run parallel to the widened Route 29 between the South Fork of the Rivanna River and Airport Road, (3) the widening and replacement of the north and southbound bridges spanning the South Fork of the Rivanna River on Route 29 in Albemarle County, and (4) other modifications to the Route 29 Corridor arising from an ongoing study by VDOT of the entire Route 29 Corridor from the North Carolina line to Warrenton. Based on its review of the administrative record, the Court concludes that the defendants took a hard look at the cumulative and connected impacts involved with the bypass project within the appropriate bounds of the analysis area. Accordingly, the Court cannot conclude that the defendants acted arbitrarily or capriciously in choosing not to prepare a supplemental EIS to address the issues set forth in Count Nine.

■ First, none of the projects mentioned by the plaintiff are sufficiently connected to the project discussed in the FEIS to warrant their inclusion in that document under 40 C.F.R. § 1508.25(a)(1). As to the widening of Route 29 from the South Fork of the Rivanna River to the Airport Road, as well as to the frontage or service roads that will run parallel to Route 29 on that same stretch, the record fails to show that the Base Case and the northern widening project, although contiguous, are interdependent. The defendants took a hard look at the need for both parts of the project in a draft EA published in 1986. In that document, the defendants stated that the widening of Route 29 all the way to Airport Road was needed to deal with the "large traffic volumes" resulting from "rapid commercial development continuing along both sides of the current roadway." A.R. at 323. However, the record shows that the defendants later determined that the "public is more inter-

ested in improving the Southern segment first." Amended A.R. at 3A. The defendants further determined that, "[i]n order to ensure public participation on the Northern segment at some future date," the draft EA should be modified to discuss only the Southern segment. *Id.* With regard to the Base Case, the defendants concluded that "the Northern terminus (Rivanna River) was logical in that the proposed 3.7 mile widening on existing alignment is usable even if no additional improvements in the area are made, it represents a reasonable expenditure of funds and does not restrict the consideration of alternatives for other reasonably foreseeable transportation improvements." *Id.* Thus, the Court is of the opinion that the defendants took a hard look at whether to include the northern widening in the same EIS with the Base Case and that it was reasonable for the defendants to conclude that the projects were of independent utility and could proceed separately.

As to the northern widening's connection to the Western bypass, although the record shows that traffic patterns on the widened Route 29 could be affected by the bypass, *see* Plaintiffs' Doc. 000172, the Court nevertheless concludes that the defendants acted neither arbitrarily nor capriciously in considering these two projects independently. First, the Court finds independent utility in the northern widening to alleviate traffic congestion due to development, *see* A.R. at 323. In addition, the fact that the bypass and the

widening can proceed separately and do not automatically trigger one another shows that the defendants were not arbitrary and capricious in deciding not to include the northern widening in the FEIS.[15]

■ As to the bridge project, the defendants sought and received a categorical exclusion under 23 C.F.R. § 771.117, which eliminates the need to undertake further environmental documentation because the project has been determined not to involve significant environmental impacts. As to the bridge's connection to the Base Case and bypass, although the Court is aware that the defendants' application for a categorical exclusion notes that the bridge should be widened to prevent a "bottleneck" from the Base Case, the Court also points out that the same document states that "[i]mprovements are also needed to address structural deficiencies of the northbound bridge." Plaintiffs' Doc. at 000483. Thus, the Court finds that the defendants took a hard look at the bridges in relation to the bypass project and concluded, without clear error, that the bridge project should go forward as a separate project.

■ As to the plaintiff's contention that the improvements mentioned in the ongoing, long-term Route 29 corridor study should have be included in a supplemental EIS, the Court is of the opinion that the future projects proposed in that study simply are not "reasonably foresee-

---

**15.** Because the Court has found that the defendants were not arbitrary and capricious in their determination that the northern widening of Route 29 has independent utility from the bypass and Base Case, the cases of *Dickman v. City of Santa Fe,* 724 F.Supp. 1341 (D.N.M.1989) and *Indian Lookout Alliance v. Volpe,* 484 F.2d 11 (8th Cir.1973), are inapposite. Unlike the Base Case and bypass here, which have been determined to be necessary regardless of whether the northern widening

is completed, the *Dickman* Court noted that "[t]he evidence is overwhelming that development of the first three phases of the highway project depends for its success on the improvements planned in the fourth phase" and thus held that an EIS must be done to encompass all four phases. *See* 724 F.Supp. at 1346. Likewise, the *Indian Lookout* court found improper segmentation when a particular section of highway did "not have an independent utility of its own." 484 F.2d at 19.

able" at present. Thus, it is not arbitrary and capricious for the defendants to choose to address issues relating to the corridor study when specific projects become a reality. *See National Wildlife,* 912 F.2d at 1478 (stating that "an EIS need not delve into the possible effects of a hypothetical project, but need only focus on the impact of the particular proposal at issue and other pending or recently approved proposals that might be connected to ... the proposal at issue").

Finally, as to the cumulative effect of the various projects, the Court believes that the administrative record shows that the defendants did assess the incremental impact of past, present, and reasonably foreseeable future actions in assessing the bypass. *See, e.g.,* Reevaluation at 43–44. As a result, because the defendants took a hard look at the issues and concluded in a manner that was neither arbitrary nor capricious that the bypass project has independent utility, the Court must conclude that NEPA has not been violated by the defendants' failure to conduct a new or supplemental EIS including all of the projects set forth in Count Nine. Thus, the Court will grant the defendants' motion for summary judgment as to Count Nine.

## V. CONCLUSION

For the reasons explained above, the Court will grant the defendants' motion for summary judgment in part and will deny it in part. In addition, the Court will grant the plaintiffs' cross motion for summary judgment in part and will deny it in part. Specifically, the Court will grant the defendants' motion for summary judgment as to Counts One, Three, Four, Five, Six, Seven, Eight, and Nine of the plaintiffs' complaint, but will grant the plaintiffs' motion for summary judgment as to Count Two. As a result, the Court will issue a declaratory judgment that the defendants

have violated NEPA with respect to Count Two and will enjoin the defendants from taking any further action related to land acquisition, site preparation, design, construction or any other action related to implementation of the proposed bypass project until a supplemental environmental impact statement has been completed addressing the deficiencies pointed out in the accompanying memorandum opinion.

The Clerk of the Court is hereby directed to send a certified copy of this memorandum opinion and accompanying order to all counsel of record.

## ORDER

This matter is currently before the Court on cross-motions for summary judgment filed by the plaintiffs and the defendants. For the reasons stated in the attached Memorandum Opinion, it is this day ADJUDGED AND ORDERED as follows:

(1) the defendants' motion for summary judgment as to Counts One, Three, Four, Five, Six, Seven, Eight, and Nine of the plaintiffs' Complaint shall be, and hereby is, GRANTED, and the plaintiffs' cross motion as to those same Counts shall be, and hereby is, DENIED; and

(2) the defendants' motion for summary judgment as to Count Two of the plaintiffs' Complaint shall be, and hereby is, DENIED; the plaintiffs' cross motion as to Count Two shall be, and hereby is, GRANTED; thus, the Court hereby DECLARES that the defendants have violated NEPA with respect to Count Two; and

(3) the defendants shall be, and hereby are ENJOINED from taking any further action related to land acquisition, site preparation, design, construction or any other action related to implementation of the proposed bypass project until a supplemental environmental impact statement has been completed addressing the defi-

ciencies pointed out in the accompanying Memorandum Opinion.

The Clerk of the Court is hereby instructed to send a certified copy of this Order and accompanying Memorandum Opinion to all counsel of record.